## JEFFREY *vs.* BIGELOW & TRACY.

Where an *agent* is authorized to *sell* a flock of *sheep*, and sells a portion of the flock with knowledge that the sheep are diseased, and does not communicate the fact to the purchaser, his *princ___* although they have no *actual notice* of the fraud, are liable *civiliter* to respond in damages to the purchaser.

And where, in such case, the purchaser mixes the sheep purchased with a flock before owned by him, and the disease of the sheep sold is contagious and is communicated to the other flock, the claim of the purchaser to damages is not limited to the loss of the sheep purchased, but extends to the other sheep to which the distemper is communicated.

THIS was an action on the case for fraud in the sale of sheep, tried at the Madison circuit in March, 1833, before the Hon. NATHAN WILLIAMS, then one of the circuit judges.

In September, 1831, one *Stevens*, an agent of the defendants, sold to the plaintiff a flock of sheep, consisting of 500 ewes and 7 bucks, which were mixed by the plaintiff with a flock which he before owned of 548 sheep. Soon after the cold whether commenced, the disease called the *scab* made its appearance among the sheep bought of Stevens, and in the winter of 1832, six of the bucks and 356 of the sheep, two-thirds of which number were of the flock bought of Stevens, died of that desease. The plaintiff also lost two-thirds of all the lambs that came from the sheep. During the year of 1832 the flock was in a bad condition; 47 sheep and the remaining buck died during the winter of 1833, and the whole flock at the time of the trial was infected with the disease. In the winter of 1832 the plaintiff incurred considerable expense in attempting to cure the sheep. It was proved that the *scab* is a contagious disease, and that by putting a few diseased sheep into a healthy flock, the whole will become infected. The sheep sold by *Stevens* were part of a flock which had been gathered by one *Hunt*, under an agreement between him and the *defendants*, whereby they had agreed to furnish *money*, and *Hunt* his *time* and *services*, in the purchase of sheep, and to divide the profits and loss. In a flock of 120 sheep, purchased by Hunt, there was from 35 to 40 sheep and from 10 to 15

lambs diseased with the *scab*—and, with knowledge of the
fact, he bought them at a reduced price.  Subsequently *he*
assigned all his interest in the concern to the defendants, and
delivered the possession of the sheep to *Stevens*, the agent of
the defendants, who was sent by them to take charge of the
sheep, and *sell* or *drive them home* to the east.  The flock
was at *Petersborough*, in the county of Madison.  There was
evidence to show that *Stevens*, previous to the sale to the plain-
tiff, *knew* that a portion of the sheep in the flock of the defen-
dants were *diseased.*  The defendants objected to the proof
which was given of the loss sustained by the plaintiff, by the
disease being communicated to the sheep owned by him pre-
vious to his purchase of Stevens; but the objection was over-
ruled, and the evidence admitted.  The defendents also, on
the plaintiff resting his cause, moved for a *nonsuit*, on the
ground that the plaintiff had failed to prove that the *defend-
ants, at the time of the sale, knew that the sheep were unsound;*
but the judge refused to nonsuit the plaintiff, ruling that knowl-
edge of unsoundness on the part of Hunt rendered the de-
fendants liable.  After much evidence on both sides as to the
unsoundness of the sheep, and knowledge of the fact by Hunt
and Stevens, the cause, under the charge of the court, was
submitted to the jury, who found a verdict for the plaintiff,
with $1525 damages.  The defendants ask for a new trial.

*B. Davis Noxon*, for the defendants.

*W. Crafts & J. A. Spencer*, for the plaintiff.

*By the Court*, SAVAGE, Ch. J.   The defendant ask for a
new trial on several grounds.   1. That the sheep sold were
not diseased.   That point was submitted to and passed up-
on by the jury, and their verdict is clearly according to the
weight of testimony.   2. That Hunt's knowledge that the
sheep were diseased was not notice to the defendants.  Even
if *Hunt* were the mere *agent* of the defendants, notice to him
when he purchased the sheep being the *res gesta*, was notice
to his principals.   "It must be taken for granted, that the
principal knows whatever the agent knows." 1 *T. R.* 16, *per*

NEW YORK,
May, 1835.

Jeffrey
v.
Bigelow.

NEW YORK,
May, 1835.

Jeffrey
v.
Bigelow

*Ashurst, J.* But Hunt was a *partner*; his knowledge and his acts were the knowledge and acts of all the partners; and although he sold out his interest to the defendants before the sale to the plaintiff, that makes no difference as to the responsibility of the defendants. Being partners with Hunt, what he knew they knew; and when they extinguished his interest, they did not divest themselves of their previous knowledge. Had they personally sold the sheep, without any other actual knowledge than that possessed by their former partner, they would be liable for a concealment of the truth. Upon this ground, it is immaterial whether *Stevens* knew that the sheep were diseased and concealed it or not; but that fact was fully proved.

Much was said, upon the argument, about the difference between the liability of the *principal* for the acts of a *general* and *special agent*. The acts of a *general agent* will bind his principal while acting with the general scope of his authority; but a *special agent*, acting under a limited power, does not bind his principal, unless his power is strictly pursued. 2 *Kent's Comm.* 620. 1 *Livermore*, 107, 8. *Paley*, 162, 3. 6 *Cowen*, 324. 15 *Johns. R.* 24. 7 *id.* 393. And Holt Ch. J. in *Hern* v. *Nichols*, 1 *Salk.* 289, said that the merchant was answerable for the deceit of his factor *civiliter*, but not *criminaliter*; for since some body must be a loser by the deceit, it is more reasonable that he who employs and puts confidence in the deceiver should be a loser, than a stranger. 1 *Campbell*, 127. 1 *Comyn on Contracts*, 242. 15 *East*, 407, 412. There is less difficulty in laying down a general proposition than in applying it to particular cases. None of the books which I have consulted have attempted to draw the line between a general and a special agent, except in general terms. Mr. Comyn, 1 *Comyn on Contr.* 236, says, if an agent is entrusted with general powers, he must exercise a sound discretion, and must do nothing contrary to the interest of his employer; when a factor or agent's power is limited, he must strictly adhere to his orders, which should always be given in writing. Paley says, by a general agent is understood not only a person substituted to transact all manner of business, but a person put in the place of another, to transact all his bu-

siness of a particular kind, as to buy and sell certain kinds of wares. A special agent is employed about one particular act, and gives an example in the case of *Fenn* v. *Harrison*, 3 *T.R.* 757, where a person was employed to negotiate a bill, without the endorsement of the principal. The agent procured the money by representing that his principles were liable. The court held they were not, because the agent's authority was limited and circumscribed. The case was again tried, and then it appeared, that when the defendants sent out their agent to get the bill discounted, they *did not say that they would not endorse it*; and then the court held the defendants liable, because the authority of the agent being unrestrained, as to the mode of getting the bill discounted, they were bound by his acts. 4 *T. R.* 177. With the limitation, as in 3 *T. R.* 757, the agent was a special agent; without it he was a general agent, as to that transaction; that is, as to that transaction he was clothed with general powers. So, in *Batty* v. *Carswell*, 2 *Johns. R.* 48, the defendant authorized another person to sign his name to a note payable in *six months*, and the agent signed it to a note payable in *sixty days*, and the defendant was holden not liable, because the special authority was not strictly pursued. The case of *Gibson* v. *Colt*, 7 *Johns. R.* 390, gives an instance of a special agency; where the captain of a vessel was authorized to sell the vessel, and in doing so falsely represented that the vessel was registered, it was held the principals were not liable, because the agent exceeded his authority. But another reason is given, which seems to me more satisfactory, to wit, that a mere power to sell, does not confer a power to warrant the title. This rule has its exceptions, but they need not be here stated. The above case is put upon *Fenn* v. *Harrison*, 3 *T. R.* 757; but upon the same case, in 4 *T. R.*, it may be doubted whether it might not have been decided the other way, upon the point of excess of authority, since it did not appear that the agent was at all restrained in the mode of selling; he was therefore authorized to sell in the usual manner of selling vessels. 6 *Cowen*, 359.

Suppose Hunt, in this case, had not originally been interested in the profit and loss, but a mere agent, would he have

been a *general* or a *special* agent? I think he would have been both ; his agency would have been *special* as to the kind of property to be purchased, but *general* as to the manner in which his purchases were to be made.  He could not have bound his principals in the purchase of horses or cattle, or any thing but sheep ; but he was necessarily to exercise his discretion as to what kind of sheep to purchase, and as to the price.  He was not limited in number, and might have purchased one or ten thousand, and his acts would have been obligatory upon his principals.

What sort of an agent, then, was Stevens ? He was sent to *sell* the sheep, or *drive them home*, that is to Troy.  He was not the agent of the defendants to purchase any thing, nor to do any act but one or other of those mentioned.  So far, therefore, he may be said to be a *special* agent ; but in relation to sales of the sheep, there was no restriction upon him, and in that respect he was a *general* agent.  He had power to sell all or any part in such numbers, to such persons and for such prices as in his discretion he thought proper.

This is not like any of the cases referred to, which were considered *special agencies*.  In *Fenn* v. *Harrison* the principals were holden, because they authorized the agent to get the bill discounted without restricting his powers ; and though no express power was given to authorize an endorsement, yet the defendants were concluded by his acts in procuring an endorsement.  The reasons are not given at length for this decision, but they must have been that *Huet* was at last not considered a *special*, but a *general* agent, as to the mode of effecting his agency.  The case of *Batty Carswell* was a case of authority to do one particular act, in a particular manner, and is therefore an example of a *special agency* ; but there is no resemblance between that case and this.  With the case of *Gibson* v. *Colt*, there is more simularity, because there was an authority, to sell a chattel.  There the agent exceeded his powers, because a sale was complete without a warranty ; although he had authority to sell, he had none to warrant—as a warranty of title, or any other warranty, was not the usual mode of selling vessels.  This is not such a case.  There is no complaint of a similar charge against Stevens.  That was a

case of *assertio falsi* — this of *suppressio veri*. It was Stevens' duty to sell as the defendants themselves should have sold, had they been personally present at Peterborough. Had they made the sale in person, and known that the sheep were diseased, it would have been their duty so to have informed the purchaser. The duty of Stevens was precisely the same; and having failed to do so, the plaintiff has been deceived and greatly injured ; and as was said by Holt, Ch. J., in *Hern* v. *Nichols*, seeing somebody must be the loser by this deceit, it is more reasonable that he that employs, and puts trust and confidence in the deceiver should be a loser, than a stranger.

But I also hold that the defendants having notice, by Hunt's purchase, (he then being a partner with them,) that some of the sheep were diseased, and were infected with a disease highly contagious, they were bound to have instructed their agent to give that information to the purchasers. It is no answer, to say that in point of fact these defendants had no knowledge on the subject. When proceeded against *civilly*, the law charges them with notice, because notice to one of a firm, is notice to all the individuals of that firm, as in law they are all one person.

As to the damages : the rule laid down by the judge at the circuit was the true one. The plaintiff is entitled to such damages as necessarily and naturally flow from the act of the defendants. That damage is not the mere difference between a diseased sheep and a healthy one, but the damage sustained by communicating the disease to the plaintiff's flock. It appears, by the testimony, that the disease is highly contagious, and in a large flock extremely difficult to cure. Had the defendants employed persons to have gone through the plaintiff's flock, and inoculated his sheep, the disease would not, probably, have been communicated with more certainty, than by turning among them a few diseased sheep. "If a person sells me a cow, which he knows to be infected with a contagious distemper, and conceals this disease from me, such concealmeunt is a fraud on his part, which renders him responsible for the damage and I suffer, not only in that particular cow, which is the object of his original obligation, but also in

NEW YORK, my other cattle, to which the distemper is communicated, for
May, 1835. it is a fraud of the seller which occasions this damage."
Ritchie *Evans' Pothier, part* 1, *ch.* 2, *art.* 3, *pl.* 166. The dama-
v. ges were therefore the natural consequences of the fraudu-
·Putnam, lent act of the defendant's agent.

New trial denied.