Durst *v.* Burton.

---

LUTHER B. DURST *v.* DAVID BURTON, JAMES FOLTS and ALEXANDER BRIDENBICKER.

(GENERAL TERM, FIFTH DISTRICT, OCTOBER, 1869.)

An association carrying on the manufacture and sale of cheese, and owning a factory and machinery suitable for its business, made, through its managing committee, a year's lease of the same to C., agreeing to provide him utensils and conveniences, in good order, for the manufacture of cheese; C. thereupon agreed to pay $600 rent and the taxes of the premises; manufacture into cheese in a skillful and workmanlike manner the milk (restricted to the produce of 800 cows) furnished the factory; ·provide materials for use in the manufacture; box and prepare the cheeses for market, half according to a size named, the rest according to hoops to be provided by the committee, insure them while remaining at the factory, and deliver them thereat as the committee should direct.

It was a further part of the agreement, that each "patron" or person supplying milk, should have a proportionate part of the whey, either fed to his stock, at so much per head on the premises, or delivered to him thereat, and that C. should account for half the proceeds of surplus whey sold by him; that C. should keep accounts, make a statement of each sale of the cheese, exhibiting the proportionate amount due to each patron from such sale, on account of milk furnished by him, after deducting the price of manufacture and charges for keeping and feeding stock;

pay the rent agreed to the committee by deductions from the proceeds of sales in proportionate sums, as due thereat respectively, omitting the two first sales; give the business all necessary personal attention; not under let it, and at the expiration of his lease surrender in good order, &c.

The committee agreed that the patrons should furnish C. one good rennet for the milk of each cow, and pay him a per centage upon each 100 pounds of cheese sold and delivered.

C. entered into the premises and manufactured cheese, some of which was sold to the plaintiff as good merchantable cheese, on behalf of the association by the defendants, who with one P. constituted the committee, and who were also patrons of the association and interested as such, in the sale. The cheese so sold had been fraudulently manufactured of sour curd by C. and his employes, and was of bad quality on that account. In an action to recover damages for fraud in the sale.—*Held*, that the defendants were liable for the fraud of C. and his employees and servants, on the ground of their agency for the defendants in manufacturing the cheese, and although the defendants might, in fact, have been ignorant thereof.

*Held* further, that the measure of damages being the difference between the actual and represented value of the cheese, and the sale having been made with reference to the market at New York, and the value at that place, in fact, and the value which it would have had there, if as represented, being shown, evidence of the amount actually realized by sale of the cheese in England was inadmissible to reduce the defendant's damages.

Nor were the defendants entitled to show that the market price for cheese at New York was controlled by the market of London, in connection with proof that through sales at London, in the ordinary course of business, the plaintiffs netted a larger sum for the cheese than the actual market value thereof in New York, and especially, when the evidence did not relate to the time in question.

CASE and exceptions on a motion for a new trial. The action was tried at the Herkimer circuit, before MORGAN, J., and a jury, and a verdict was rendered for the plaintiff for $1,400.

Exceptions were taken and a case made on the part of the defendants, and were ordered to be heard, in the first instance, at the General Term.

The material facts are stated in the opinion.

*F. Kernan*, for the plaintiff.

*R. Earl*, for the defendants.

Present—BACON, FOSTER and MORGAN, JJ.

Durst *v.* Burton.

By the Court—FOSTER, J.   The action was brought to recover damages for a fraud alleged to have been committed by the defendants, in the sale by them to the plaintiff of a large quantity of cheese.

Previous to and during the year 1866, the defendants were members of an association for the manufacture and sale of cheese, at Frankfort, in the county of Herkimer, and were joint owners as such, with their associates, of the cheese factory, with all the machinery and utensils used in the business, and were members of a committee for the management of the affairs of the association, and were also interested in the cheese to be made there; they severally furnishing a portion of the milk to be manufactured into cheese.

About the 8th of August, 1866, the plaintiff made a bargain with them, in pursuance of which they immediately afterward delivered about 40,692 pounds of cheese, to be shipped to one Burrill, a commission merchant and cheese dealer, in the city of New York.

When the bargain was made, a part of the cheeses were in their boxes, and a part were uncovered; and afterward, the residue of the cheese was boxed by the defendants, or under their direction, and were marked or branded with the name of their cheese factory, and directed to the care of Burrill, at his place of business in the city of New York; and the plaintiff paid to the defendants, toward the cheese, the sum of $5,000.

Afterward, the plaintiff and defendants disagreed as to the bargain which had been made, and the defendants in this suit and their associates, commenced an action against Durst in this court, and in their complaint charged that the cheese was sold to him; that the sale was absolute, at the price of seventeen cents per pound, and claimed to recover of him at that rate for the whole amount of cheese, after deducting the $5,000 which they had received.

Durst, in his answer, claimed and set up that the bargain for the cheese was made by him as the agent of Burrill, and not for himself.   That his agency was known to them at the

time of the bargain. That the cheese was not purchased, but was to be shipped by them to Burrill in New York to be sold by him on commission, and that the defendants were to be paid the net proceeds, after deducting expenses and the commissions of Burrill, and the $5,000 which had been advanced to them.

That Burrill received and sold the cheese on commission, and rendered an account thereof; that the net proceeds was $6,309.97, leaving a balance due to them of $1,309.97, which together with interest amounted to $1,316. That he delivered to and left with them the account, and tendered to them the said sum of $1,316, which they refused to accept.

That the tender was made before the commencement of that action, and he offered to bring the money into court. That issue was tried before referees, who found a sale of the cheese to Durst at seventeen cents per pound, and charged him with the whole amount and interest, deducting the $5,000 which had been advanced; and judgment was rendered against Durst for the balance over the $5,000, and the interest, amounting to the sum of $2,025.02, besides costs. Judgment was thereupon rendered in their favor, against Durst for that amount and costs, and the judgment was paid and satisfied.

Afterward Durst commenced this action, and in his complaint he set out, the complaint and answer, report of referees, and judgment, in the other action; and alleged the said payment thereof; and then claimed to recover against these defendants (*as upon a sale to him*), for a fraud committed in the sale of the cheese; alleging that the defendants fraudulently represented the cheese to him to be of a good marketable quality. That the defendants, their agents and servants, had knowingly used sour, adulterated, and rotten milk and curd, in the manufacture of the cheese; by means of which the cheese was of an inferior quality, and unfit for use; all of which was known to the defendants, their said agents and servants, but which was unknown to the plaintiff, and which they concealed from him, with a view to induce

Durst v. Burton.

him to purchase the cheese and to defraud him; and he claimed damages to $2,500.

The answer of the defendants did not deny any of the allegations concerning the prior action or the proceedings and judgment therein, or the payment of that judgment by the plaintiff.

But they denied that they had the general charge, management or control, of the making or sale of the cheese, or that the cheese was of an inferior quality, or improperly made; and they denied every allegation of fraud charged in the complaint, or that the plaintiff relied on any representations made to him, but that he purchased relying on his own inspection of the cheese. They also denied any intent to cheat or defraud the plaintiff; or that he sustained the damage alleged in the complaint. And they denied that they were a committee for the sale of the cheese, or that they did sell it to him.

The undisputed testimony showed that the defendants were owners, with a number of other associates, of the cheese factory in question. That they furnished a portion of the milk out of which the cheese in question was manufactured. That they were owners of their proportionate share of all the milk delivered to the factory, and of all the curd and cheese manufactured there, at all times until the sale to the plaintiff took place, and that they were a committee of the association, and as such had the oversight of the affairs of the association. The jury could not well doubt, under the evidence, that two of them at least, if not all of them, were acting in and made the sale of the cheese to the plaintiff, and that they represented the cheese to him as being of a good marketable quality. The jury were also well warranted in finding, that the persons who were engaged in the manufacture of the cheese, fraudulently used sour and damaged milk and curd in its manufacture, which was concealed from and unknown to the plaintiff; and that the cheese was of a very inferior quality, and a large portion of it unfit for market, whereby the plaintiff sustained damage to a larger amount than was

recovered by the verdict; and I think the jury would have been warranted in finding, that at least one, if not two of the defendants knew of such improper and fraudulent manufacture of the cheese in question, while it was being made.

The plaintiff, however, cannot claim here, that the jury have so found, nor can he rely upon what he claims to be the law of the case; that he is entitled to recover against them, merely because as vendors they stated that the cheese was a good marketable article, even though they were not aware that it was fraudulently made; because the court charged the jury "that if there was no design by the defendants, or their agents or employes to commit a fraud, but the cheese, or some of it, was badly manufactured, for want of skill, or by accident, the defendant would not be liable to the purchaser in this action; and that if General Campbell, and those employed by him, put sour curd into the cheese, without fraud, then the defendants are not liable."

The court also charged the jury, among other things "that General Campbell was employed by the defendants as the agent to manufacture the milk of the patrons of the factory into cheese, and he was authorized to employ other help for that purpose. If General Campbell, or those employed by him to assist, purposely and designedly used the tin hoops to conceal the sour curd in the cheese they manufactured for the patrons of the factory, so as to materially injure the quality of the cheese, these defendants having sold the cheese for good cheese, although having no actual knowledge of the fraud, are responsible to the purchaser for the fraud committed by their employes and agents." To which the defendants' counsel excepted.

The court also held and decided "that the defendants were responsible for any fraud in the manufacture of the cheese which affected its goodness in the market, whether it was committed by General Campbell himself or by the cheese makers he employed, or by any servants in their employ. If it was actually put into the cheese (this sour curd) so as to affect the cheese, the defendants in this case, having sold the

Durst *v.* Burton.

cheese for good cheese, are responsible, although they had no absolute knowledge of the fact, on the ground that they were bound to know it and communicate it; and that the only question (aside from the quantity of damages in case the verdict should be for the plaintiffs) was whether the alleged fraud in the manufacture of the cheese was committed by General Campbell or his servants." To which the defendant's counsel excepted.

In order, therefore, to maintain the verdict it must appear that the relation of the defendants to General Campbell and his employes was such as to constitute him and them agents or servants of the defendants.

If it was not, the plaintiff was not entitled to recover; and if it was, I have no doubt that they are responsible for the fraudulent acts of any of them, though in fact the defendants were ignorant of the fraud.

It is an elementary principle, and one absolutely necessary for the protection of innocent persons, that a party shall be held accountable for the fraudulent acts of his servant or agent in the transaction of the business intrusted to him where such fraudulent acts result to the injury of a third person who in good faith deals with such party or agent and suffers thereby.

The authorities in support of this proposition are numerous and conclusive, and those cited to us by the plaintiff's counsel (Story on Agency, chap. 17, sec. 452; 2 Kent's Com., 11th ed., 842, note *a; Jeffrey* v. *Bigelow*, 13 Wendell, 518, 519, 520, &c.; *Bank of U. S.* v. *Davis*, 2 Hill, 452; and *Griswold* v. *Hover*, 25 N. Y., 595, 600, and cases there cited) are full to the point; and see Dunlap's Paley (4th Am. ed., 301 302, and cases there cited under note [1]).

And the rule is the same as to the liability of partners for the frauds of each other, and upon the same principle. (13 Wendell, *supra*, 520; 25 N. Y., 597, 600; 1 Tenn. Rep., 12.) That in all their copartnership acts, they act as the agents of each other and of the firm.

The only question arising on the merits is, was General

Campbell, and were his employes the agents of the defend-
ants, so as to bring the defendants within the rule above
stated ?

On the 6th day of February, 1866, the defendants and one
Pierson, who was also a member of the committee, entered
into a contract with General Campbell, in substance as fol-
lows : To lease to him their cheese factory, building and
premises, utensils and appurtenances for manufacturing cheese,
and to furnish all necessary presses, cheese hoops, setters and
rangers for the use of the factory, with an ice-house, and a
proper place to keep lime, for the sum of $600 for one year ;
to commence March 1st, 1866, and ending the last of Feb-
ruary, 1867 ; Campbell was to pay the $600 to the committee,
or association, manufacture the milk furnished to the factory
into cheese and take care of the cheese until sold and taken
away, in a good, skillful and workmanlike manner ; furnish
all the cheese boxes (which were to be good), all the bandag-
ing, salt, annatto, press cloths, ice, wood, coal, lime, and
everything necessary to manufacture the cheese, except that
each patron was to furnish one good rennet for each cow
whose milk was taken to the factory.  That after the two
first sales of cheese made, Campbell was to pay, and have
taken out and deducted the proportion of rent due from him
at each sale thereafter.  He was to pay all taxes assessed on
the premises during his lease ; to keep an insurance on the
cheese of $5,000 while in the factory, and was to weigh, box
and deliver the cheese at the factory, to such persons, at such
times, and in such quantities as the committee should direct.
He was to press one-half of the cheese in quantity, in the
same sized hoops as were used there the year previous, and
the other half in smaller hoops, as the committee should fur-
nish and direct.  He was to keep proper books and accounts,
make a statement at the time of each sale, embracing the
amount of milk and the quantity of cheese of each patron
included in the sale, and showing the proportionate amount
of each patron after deducting the price of manufacturing the
cheese and feeding the hogs of such patron.  At the end of

the lease he was to leave everything in good order, ordinary wear and tear excepted. He was to use diligence to detect all diluted, adulterated, filthy, skimmed or sour milk, and inform the committee of the persons so offending, whereupon it becomes the duty of the committee to stop such persons from delivering any more milk, and if the committee refused so to do, Campbell was authorized to put an end to the agreement. If patrons chose to keep hogs at the factory, they had a right to do so, at the rate of one hog for five cows, and Campbell was to feed them with the whey and was to receive six cents per week for each hog so fed by him, or they might take away their proportion of the whey, daily in a quantity of three-fourths of the amount of the milk, which they furnished, and if Campbell sold the surplus whey he was to account for one-half of the proceeds. He was to feed and take care of the hogs of the patrons, which were kept there in a proper manner, and was to give the business in and about the factory, all necessary personal care and attention, *and he was not to underlet the same.* The committee contracted and agreed that the patrons should pay to Campbell at the rate of $1.65 for every 100 pounds of cheese so manufactured, when sold and delivered. They were to see that the vats, utensils, whey conductors, floor, sink, hoisting apparatus and drain were to be put in good order to start the factory, and were to indemnify Campbell against any damages in consequence of the factory being stopped during the time of making cheese, by the acts of any person other than the patrons, or of Campbell himself. That Campbell should not engage or contract, and receive the milk of more than 800 cows, to be manufactured into cheese, there, and that he should not make any extra charge in case he manufactured the milk into cheese twice a day in separate messes.

Campbell, who was a witness for the defendants, supposed that property in the cheese was in him, and that his assent was necessary before a sale could be effected, but I think it is perfectly clear that the contract gave him no authority

over the cheese, except to take good care of it, and to deliver it as the committee should direct him. And the contract gave him no such interest in it, as would make him the proper party to fix a price upon it. He had no ultimate interest in regard to it, beyond one and sixty-five one-hundredths of a cent per pound, the price which he was to receive when it was sold; and as to that, he had the express contract of the committee, that the patrons should pay it; and at all events it was unimportant to him, whether the cheese brought a full price or not, so long as he got his price for making it while the patrons were interested, and their committee, for them and for themselves, in obtaining for it all that it was worth in the market. But there can be no dispute upon the construction of the contract, that the patrons alone owned the milk, the curd, the whey, and the cheese at all times, until it was sold to the plaintiff. It was made for them, and every step in the process of making it was taken for them, at their risk and at their expense, and it cannot be doubted from the contract, that it was intended that the committee should have the general oversight of it, and that they could stop the manufacture of it, if Campbell did not follow their instructions in regard to it. And the proof shows, that the members of the committee were, some of them, sometimes, once or twice a day, and sometimes less frequently, at the factory, as such committee, attending to the business going on there. I think that Campbell, and those immediately under him, were none the less the agents or servants of the defendants because he leased the factory. The whole thing was a contract, by which he was to manufacture the cheese for the patrons who were represented in and by the contract, and for no others, because all who were to become patrons, even if they were not so when the agreement was executed became patrons under that agreement, and were subject to all its provisions in their favor, and in favor of Campbell. And Campbell could neither extend the amount of patronage beyond the milk of 800 cows, nor was he at liberty, though the patrons under that agreement should furnish milk from

Durst *v.* Burton.

less than 800 cows, to make cheese there, for other persons not patrons, upon any terms whatever.

He was, therefore, their agent under a special rate of compensation set forth in the agreement, and his employes were also the agents and servants of the patrons of the factory.

· A large class of cases has been cited by the counsel for the defendants, for the purpose of showing that a person situated as Campbell was, is not an agent, so as to make the defendants responsible for his fraud, or the fraud of those who helped him to manufacture the cheese. I, however, fail to discover any analogy between any of these cases and the one under consideration which calls upon us to relieve the defendants from the consequence of their fraudulent conduct. They are all cases of actions brought to recover damages sustained by negligence, and brought against municipal corporations which have contracted with individuals to improve streets or to make other improvements, or repairs for such corporations; against individuals who had contracted with others to build houses or walls, or other erections for them; against persons who have contracted with steamboats or tugs to tow their vessels, and which have been so towed that collisions have occurred and damage has been sustained thereby by the parties suing, and in other kindred cases; and where in all the cases the negligence has been the act of the party contracting to do the work, or perform the service, or of his subordinates; and where the injury has happened while the work was being performed by him and was unfinished; where the negligent act of such contractor was the immediate and only cause of the injury; where no act of the defendant contributed to the injury; where no possible benefit occurred to him in consequence of the act; and where also the law would afford redress by action against the party whose negligent act caused the injury.

In this case I think I have shown that the defendant and all the patrons had the control and direction of the making of their cheese, and at least that they were bound to know whether it was honestly made or not. The injury to the

plaintiff did not happen while the cheese was being made. It did not happen *immediately* from the fraudulent manufacture of the cheese, but afterward when the sale took place from the fraudulent making, and from the representations of the defendants taken together. It can scarcely be claimed that this plaintiff could maintain an action against Campbell, though it were admitted that he or his employees committed a fraud in making it. And it is very clear that by selling the inferior article, as they did, for a good marketable one, they were benefited and received a much larger price for it than they were entitled to receive from the plaintiff, and a much larger price than he would have paid them if he had not been induced by them to suppose the cheese was good.

It is because the principal receives more in consequence of the fraud of his agent, in the sale of his property, than he otherwise would, that the law holds him in a civil suit, as having adopted the act of the agent, and made it his own. And it is for that reason that he is held liable to the purchaser for the damages which he has sustained. It was the fault or misfortune of the defendants, that they allowed the fraudulent manufacture of their cheese, and therefore inequitable that they should so act, though ever so innocently, as to charge the plaintiff with the consequences.

The defendants' counsel offered in evidence, the account of sales rendered by Burrill, and which was set up in the previous action, by which it appeared that the net proceeds of the cheese, almost all of which, it appeared, was shipped to England and sold there, amounted to $6,309.97, as evidence to reduce the damages of the plaintiff. The plaintiff's counsel objected and the court excluded it, and defendants' counsel excepted.

The ruling of the court was correct. It had been proved, that the cheese in question, if it had been, as it was represented, was worth in New York the sum of nineteen cents per pound, and that as it was, it was only worth twelve. New York was the market to which both parties knew the cheese was to be sent, and the defendants had it marked for that

market; and proof of what the cheese actually brought in England, could not be competent to change the rule of damages, which clearly is the difference between what it would be worth, if as represented, and what it was actually worth as it was. The question, whether the ultimate loss of the purchaser was actually more or less was wholly immaterial. For aught that appears before the sale in England took place, the price of cheese, both there and in New York, had materially advanced, and at all events, it was not only incompetent evidence, but it would be manifestly unjust to allow to the defendant, that rule of damages in this action, when they repudiated that account when it was rendered to them, and the balance of it, over the $5,000, was tendered to them, and when they brought an action, and recovered of the defendant a greater sum, by more than $600.

The defendants' counsel asked one of their witnesses: "Is the market for cheese in this country largely controlled and influenced by prices in London and Liverpool?" The plaintiff's counsel objected to the question. The defendants' counsel said that he proposed to show the market of London, for cheese, is just as good a test for the price of cheese as New York; that he offered it with the view of making the account of sales competent evidence, and that he proposed to show that the cheese was sold in London. The court excluded the evidence, and defendants' counsel excepted.

The defendants' counsel then offered to show, by the witness, that the cheese market of New York, and of this whole country, is controlled and regulated mainly by the price of cheese in London and Liverpool, and proposed to follow it up by showing that this cheese was shipped to London, and sold in the market of London to divers purchasers, and netted the plaintiff, over and above all expenses, at Frankfort, sixteen and a half cents per pound; and also proposed to show that the sale was made in the ordinary way, by the returns, in the ordinary course of business. This was objected to by the plaintiff's counsel, and the court excluded the evidence, and defendants' counsel excepted.

The defendants' counsel then offered to prove the same facts as above offered, and to follow it up by showing that the plaintiff said the cheese brought such a price in London as to net him sixteen and a half cents per pound at Frankfort. This also was objected to and excluded, and defendants' counsel excepted.

None of the authorities cited by the defendants' counsel tend to establish the rule of evidence which he contends for. The true question was, what would this cheese have been worth in the market in New York when it reached there, if it had been as represented, and what was it worth there, at that time, as it was? There was no doubt, on the trial, that there was then a market price in New York for cheese, which was well known there from day to day, and in such case, the parties must prove what it was there; and it is only in cases of uncertainty, as to the market there, that parties will be allowed to prove the market price elsewhere as approximate evidence of value. And besides, when parties are allowed to prove the market price elsewhere, it must be confined to what the market price was at the time in question, and not what it became a month or months afterward.

Campbell had been sworn as a witness for the defendant's, and on his direct examination had testified, that all of the cheese in question was made before the 8th of July, 1866.

That Faulkner had all the cheese made previous to that which was sold to the plaintiff, and that one Crist had the cheese immediately after that of the plaintiff during the month of July. And he testified that no sour curd was used till the last of July or in August. And that he discovered no sour curd; and that no bad cheese was made till August.

On his cross-examination, he testified that Crist purchased four cheeses at the factory which were made in the month of July, and not before the tenth of that month; and that one of those cheeses was sent back to the factory from New York by Crist.

The counsel for the plaintiff then asked the witness, "Was

that a good or bad cheese?" and whether the defendants made an allowance to Crist on account of the bad quality of the cheese? The defendant's counsel objected to each of the questions as incompetent and immaterial. The court overruled the objections and admitted the testimony, and the witness answered that the center of the cheese was bad; and also that the defendants did make such allowance.

So too, against the objection of the defendants' counsel, and after the defendants had rested, Crist was called as a witness for the plaintiff, and testified that he had six large cheeses of the defendants; that he bought four of them, and took two on commission; that they were made in July, and that he took them in August; that he saw and examined the one of them that was sent back; that it was sent back to him, and that he took it to the factory; that it "was as bad a cheese as he ever saw, and smelt very offensively."

I have no doubt that all this testimony was competent. In order to rebut the proof which the plaintiff had given to show that the sour curd had not been fraudulently introduced into, and formed a part of the cheese, which had been sold to him, Campbell had been called, and one or two other witnesses on the part of the defence, to prove that there was no sour curd there, and that no bad cheese was made until August; and this testimony by Campbell himself, and by Crist, was properly introduced to show that the statement of Campbell, that no sour curd was used, and no poor cheese was made until August, could not be relied upon.

It was claimed on the part of the plaintiff, and the testimony of witnesses on his part tended to prove, that for the purpose of introducing the sour curd on hand into the center of the cheese Campbell had procured and used a tin hoop, by means of which a pan full of sour curd could be held in the center of the cheese and surrounded with sweet curd, while the cheese was being made up. So that when the cheese was manufactured the sour part of it would be surrounded on all sides by the pure curd. The defendants then proved by their cheese maker, who was the daughter or step-daughter

of Campbell, that she had seen such a tin hoop used in a cheese factory in Rome and also in a factory at Wallsville, in Oneida county, and that the tin hoop used in the factory at Frankfort was procured at her suggestion.

When Crist was afterward examined, the plaintiffs asked him " What do you say as to the practice being prevalent of using a tin hoop to put cold curd into the center of a cheese ?" This was objected to by the defendant's counsel as incompetent and immaterial. The court admitted the evidence, and the defendant's counsel excepted. And the witness answered, "I have never heard of it until this case; this is the only instance that I ever knew or heard of its being tried; there are two modes of using cold curd left over. Some put it in the next day's curd and others press it and cap the cheese. They put it in the next day's curd by mixing it through, and do not put it in a lump together. I never heard of its being put in a lump in the center until I heard it here to-day."

I have no doubt that this testimony was competent. It was competent for the defendants to prove that such a hoop was and had been in use in other factories, and if this testimony had not been given in reply, the defendants might well have claimed that such hoops were in general and common use.

Other exceptions were taken during the trial, but no point is made on any of them before us. I have, however, examined them, and think that no error was committed by the judge.

The motion for a new trial should be denied and judgment should be entered upon the verdict for the plaintiff.

BACON and MORGAN, JJ., concurred.

Judgment accordingly.