ISRAEL T. DEYO and CHARLES H. HITCHCOCK, Appellants, v. CHARLES I. HUDSON and Others, as Copartners under the Firm Name of C. I. HUDSON & COMPANY, Respondents.

Third Department, November 15, 1916.

Fraud and deceit — action by members of law firm against stockbrokers to recover firm moneys and moneys belonging to clients embezzled by junior member of firm and lost through dealings with defendants on margin — evidence.

The junior member of a law firm opened an account with a branch office of a firm of stockbrokers, and traded on margin, losing all of his own money and several thousand dollars belonging to the law firm and to its clients. He thereafter closed the account and confessed to the senior member of the firm, who with the aid of the relatives of the junior member, made good the losses and advised said junior member that he could not remain in the firm, but subsequently, upon his apparent reformation and promise not to repeat his thefts, he was readmitted to the firm. Thereupon the senior member had a conversation with the agent of the stockbrokers in charge of their local office and told him that the junior partner had been speculating and had lost every dollar he had, and as his firm handled a great many trust funds, it could not retain a person as a member who dealt in stocks on margin. The agent said that his firm did not take customers on a marginal account who occupied trust positions, and that he would advise the senior member if the junior member should do any more trading on margins. As a matter of fact, at the time of this conversation, the junior member had reopened a marginal account and during the next two years embezzled large sums of money belonging to the firm and its clients which was nearly all traced into the account with the brokers. The remaining members of the law firm then brought an action for fraud and deceit to compel the stockbrokers to make good the losses sustained by reason of their obligations to clients whose property had been taken, and based the action upon the defendants' dealings with the junior member and their fraudulent and false representations and statements of and their concealment from the law

firm, and depended principally upon the situation as it existed at the time of the conversation between the senior member and the defendants, agent, which conversation as related by the senior member, constituted the principal evidence in the case. The plaintiffs tried the action upon the theory that it was incumbent upon them to establish the representa_ tion, falsity, scienter, reliance and proximate damage.

Evidence examined, and *held*, sufficient to establish the plaintiffs' cause of action, and that a judgment granting a nonsuit should be reversed and judgment entered for the plaintiffs.

APPEAL by the plaintiffs, Israel T. Deyo and another, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of Broome on the 21st day of May, 1915, upon a dismissal of the complaint by direction of the court at the close of the case, and also from an order entered in said clerk's office on the 15th day of April, 1915, granting defendants' motion for a nonsuit and directing that judgment be entered thereon.

Defendants moved for a nonsuit and to dismiss the complaint at the close of the case. The court reserved decision and submitted certain questions to the jury which rendered a special verdict. Defendants then moved to set aside said verdict and for a new trial. After a hearing on the motions the court granted the motion for a nonsuit.

*Harvey D. Hinman,* for the appellants.

*Worcester, Williams & Saxe* [*John Godfrey Saxe, Edwin D. Worcester* and *Henry G. Seipp* of counsel], for the respondents.

WOODWARD, J.:

The action is for fraud and deceit, the plaintiffs appealing from a judgment of nonsuit.

At the close of the plaintiffs' case the defendants moved for a nonsuit, and the court reserved decision until the end of the defendants' case. The defendants offered their evidence and at the close of the entire case renewed their motion for a nonsuit and moved for the direction of a verdict. The court stated that it would submit certain specific questions to the jury for their determination and after the same should have been passed

upon by the jury the court would determine the motion for a nonsuit and for the direction of a verdict. The court then submitted to the jury eight questions; the first dealt with the broad question whether the plaintiffs had proved their cause of action, and the balance dealt respectively with seven items of the plaintiffs' alleged damages. These questions were all answered in the plaintiffs' favor, and the entry of judgment suspended until a full argument of the defendants' motion for a nonsuit and for the direction of a verdict. Thereafter, an order was entered granting defendants' motion for a nonsuit and directing that judgment be entered accordingly, upon which judgment was entered dismissing the action; and the plaintiffs appeal.

From the year 1909 to November 26, 1912, the plaintiffs and William B. Carver had been practicing law in the city of Binghamton as a partnership under the firm name of Deyo, Hitchcock & Carver.

The defendants, under the name of C. I. Hudson & Company, were engaged in the business of buying and selling securities on the New York Exchange and commodities on the Chicago Board of Trade and the New York Cotton Exchange on a commission basis, for customers, and opened a branch in Binghamton in 1908. Mr. Mitchell became manager of the defendants' Binghamton office at the time it was opened and remained such until the time of the trial in 1914.

In March, 1919, Carver opened an account with the defendants in their Binghamton office and did a considerable speculative business on margin until August, 1910, when he closed the account. On March 20, 1910, Mitchell wrote the defendants at their principal office in New York as follows: " Our new customer, W. B. Carver, will make a good trader and pay big commissions if he gets away right; he expresses great faith in Mr. Hudson's opinion; have looked him up and find that his father left him a lot of money, and that he has a large law practice. He is only one of a dozen that are here and they will all come around in time."

Carver, however, was not successful in his trading, and when he closed the account in August, 1910, had lost heavily.

Up to about the middle of August, 1910, neither of the plain-

tiffs suspected that Carver was engaged in the business of trading or speculating in stocks, and Carver had borne the reputation of being a man of excellent habits, clean in his personal life and honorable in his business transactions, and was of very high standing in the community. About that time the plaintiff Deyo discovered that more than $20,000 of funds and securities belonging to clients of Deyo, Hitchcock & Carver were missing. This discovery was made by Carver's confession to Deyo that he had been speculating, that he had lost all of the property he owned and had embezzled large sums belonging to the firm and clients of the firm and that these losses had been sustained by him through his dealings with the defendants in their Binghamton office. These losses of clients were made good by the plaintiffs and by relatives of Carver and his wife. Carver's conduct, however, was kept from the public and was known only to the plaintiffs, two or three relatives of Carver's, and to the pastor of the church of which he was a member.

Upon the disclosure to the plaintiff Deyo, Carver was advised by the plaintiffs that he could not remain in the partnership, but he stayed in the office for some time assisting in straightening out matters which had become involved by his embezzlements. Carver gave evidence of reformation; he voluntarily confessed his guilt to his pastor and tendered his resignation as a deacon of the church. His health being impaired, relatives requested the plaintiffs to give him a chance to remain in the law firm. The plaintiffs discussed the matter between themselves; his conduct was such that he regained the confidence of the plaintiffs to the extent that they believed he had reformed and would not repeat his thefts, provided he kept away from the stock market. This he promised to do, but pending his readmission into the firm and about the 1st of November, 1910, the plaintiff Deyo sought out Mitchell and had a conversation with him, to which a full reference will later be made. Unknown to the plaintiffs, Carver had reopened his marginal account with the defendants on October 21, 1910. Carver was later readmitted to the plaintiffs' firm and so continued to November 26, 1912, when he disappeared from the city of Binghamton and has never been heard from since. It was then discovered that he had been operating on

speculative account with the defendants' Binghamton office from October 21, 1910, down to the date of his disappearance and had lost many thousands of dollars, and to cover these losses he had embezzled large amounts of moneys and securities belonging to clients of the law firm, which had been in the firm's hands for investment, reinvestment and safekeeping.

Practically all of the property embezzled by Carver was traced into the account he maintained with the defendants from October 21, 1910, to the time of his disappearance.

The plaintiffs then brought this action to compel the defendants to make good the losses they had sustained by reason of their obligation to clients whose property had been taken, and based the action upon the defendants' dealings with Carver and their fraudulent and false representations and statements to and their concealments from the plaintiffs, and they depend principally upon the situation as it existed at the time of the conversation between Deyo and Mitchell about the 1st of November, 1910, and upon that conversation itself. Either on the theory of a nonsuit, or by virtue of the jury's verdict, this conversation must be taken to have occurred as Mr. Deyo related it. Because of its important bearing upon the questions raised upon this appeal, it is set forth in full.

The plaintiffs did not know that Carver had reopened his account with the defendants on October 21, 1910; Carver had evidently reformed, and had passed his promise never again to engage in stock speculation; the plaintiffs had been solicited to take Carver back into the firm, and they were reconsidering the question of his remaining with the firm. In this situation Deyo sought out Mitchell about the 1st of November, 1910, and the following is Deyo's statement of the conversation: "I said to Mr. Mitchell that 'my junior partner has been speculating here in your office; he has lost every dollar he had; he has stripped himself completely; he has lost what he had, over here. As a member of our firm he has to do with a great many trust funds, we are handling a great deal of money and securities for clients, and our clients would not trust us, and very properly, if they understood that any member of our firm, or any man connected with the office was engaged in that line of business; and that Col. Hitchcock and myself are considering the

matter of retaining him in the firm; we will not retain him in the firm or permit him to be connected with the office if he engages in that sort of business.' I said to him that Carver had promised that he would not, which was true. I told him that Carver was a valuable man in some ways in the office, that he was a very accurate man and very painstaking man and that he could earn a living there, but I didn't know where he could earn a living elsewhere. And that question was up, that Col. Hitchcock and I were discussing as to whether we should retain him in the firm or not. And said, ' What I want you to do, I want you to let me know if he comes back here to do any more trading on your board.' In speaking about handling trust funds or funds belonging to estates, Mitchell replied: ' Oh, that is all right.' He said, ' We never take on a customer on a marginal account who occupies a trust position like,' he said, ' a bank clerk.' And he used the expression, ' insurance clerk;' and I said, ' yes, that is the case exactly; we are handling a large amount of trust funds and moneys belonging to other people;' and my recollection is, although I would not testify to it positively, that I also told him in that connection, that he had not only stripped himself of everything that he had but that he also had lost everything that his wife had, what little she had. When I said to him that he has lost everything he has got, he said, ' I am surprised, I supposed he was a very wealthy man, and his father was a rich man and he was very wealthy.' I said, ' No, Mr. D. H. Carver was not a wealthy man and he left practically little to Will, but whatever he had is gone, he has lost it over here, and I want you to let me know if he comes back here to do any more trading in your office;' and he replied that he would do so. * * * I told him when we discovered it that we had concluded to notify Carver that he could not remain in the firm or connected with the firm in any capacity whatever; but that he had promised that he was through with that, and we were reconsidering the matter of retaining him in the firm."

The gravamen of the plaintiffs' action is fraud and deceit; the plaintiffs tried the action upon the theory that it was incumbent upon them to establish the five propositions, the representation, falsity, scienter, reliance, and proximate dam-

age, and it is well now to consider whether the facts will sustain the different elements of an action of this nature.

The defendants claim that there is no legal misrepresentation in this case because, *first,* the promise to do an act — here Mitchell's promise to advise Deyo if Carver resumed trading — is not in law a misrepresentation; and, *second,* that Mitchell's silence in respect to Carver's resumption of his activities does not amount to legal misrepresentation, for there was no duty on Mitchell to speak. It is true that the complaint alleges the promise on Mitchell's part to advise the plaintiffs; but it is likewise alleged in the complaint that the defendants intended to cause the plaintiffs to believe that Carver had not resumed his speculative operations, and we think the facts would have warranted an even stronger statement in the complaint. There is no room to doubt that Mitchell knew that Carver would not be readmitted to or retained in the partnership of lawyers if it had been known to Deyo at the time of the interview between Deyo and Mitchell that Carver had again commenced trading in the stock market; and while it is true that he promised Deyo to advise him if Carver recommenced his operations, he also advised Deyo, when the latter told him that Carver handled trust funds or funds belonging to estates, that his firm never took on a customer on a marginal account who occupied a trust position. From this positive statement of fact it may be inferred that Mitchell intended Deyo to understand not only that the defendants would not accept Carver's account in the future, but that Carver then had no account with them. Ideas are not always expressed nor intended to be expressed in direct language. Where different inferences may be drawn from conduct of parties or from the evidence, it is the province of the jury to draw them. (*Powell* v. *Powell,* 71 N. Y. 71; *Kain* v. *Smith,* 89 id. 375; *Hart* v. *Hudson River Bridge Co.,* 80 id. 622.)

Nor is it a sufficient answer to this branch of the case to assert that no obligation rested upon Mitchell to speak; for he did not rely upon a supposed right to keep silence, but positively made to Deyo a statement, a fair inference from which was that Carver was not then in the market. Not content to remain mute, he spoke; and, so, made the representation.

We may pass over the questions of falsity and *scienter*, for there is abundant evidence in the record to sustain the plaintiffs' contention upon these elements of their action.

The defendants assert that the plaintiffs did not rely upon the statements of Mitchell, but rather relied upon the promises made to them by their partner, Carver, that he would not again trade in stocks. They testify that they did so rely and in support of the fact of such reliance it is pointed out that if they had intended to rely alone upon Carver's promise, that promise would have been sufficient for their purposes, and Deyo would not have sought the interview with Mitchell or endeavored to procure from him any promise or statement in respect to Carver's affairs. The plaintiffs' actual reliance upon the representation is not an unfair or unwarranted inference from the evidence.

The defendants' claim that the representations of Mitchell were not the proximate cause of the plaintiffs' loss cannot be sustained. From March to August, 1910, Carver carried a speculative account on margin with the defendants and during that time he paid them large sums of money by way of commissions and sustained large losses. No one was in a better position to know this than they, and until August, 1910, they and Carver were evidently the only persons who did know it. He then closed his account for two months and reopened it on October twenty-first. If his account should become active and continue for some time they naturally expected that in the course of time he would pay them further large amounts of money by way of their commissions; as matter of fact these commissions in the following two years amounted to about the sum of $10,000, their profits in the transactions. It was clearly to their interest, therefore, that nothing should be done which would result in the closing of the account, and as one of the presumably necessary considerations for keeping this account alive, it was highly desirable that Carver should continue his association with the respectable and prominent firm of attorneys with whom he was connected. Such was the situation at the time the misrepresentations were made. At that time the defendants' representative was advised by Deyo that in his

dealings with them Carver had lost all his own and his wife's property and had stripped himself financially. And yet in a short twenty-four months Carver brought to the defendants' office cash and securities amounting to about $50,000. Whence came they? The defendants do not disclose any information that came to them in respect to a new source of income that Carver became possessed of; they could not have supposed that these large sums came out of his law practice, for Deyo had, in a measure, negatived any such notion by advising Mitchell that a continuance of Carver in the firm would yield him a living. But the defendants did know that as a member of the plaintiffs' firm Carver had to do with many trust funds and was handling a large amount of moneys and securities for clients of the firm. The defendants likewise knew that Carver's transactions, stripped of all ameliorating verbiage, differed little from ordinary gambling upon the daily fluctuations in the quoted prices of stocks and grain. It is a matter of common knowledge, of which the defendants can hardly be said to be ignorant, that men without resources of their own, who handle trust funds and gamble on the stock market, are confronted with the temptation to use funds not their own to carry on such gambling transactions, and all too frequently yield to such temptation and become embezzlers. This knowledge must have been one of the cogent reasons which impelled the defendants to establish the rule declared by Mitchell to Deyo.

In this connection may be noticed the strenuous efforts of Mitchell and Carver to induce the New York office of the defendants to desist from sending to his law office mail relating to Carver's transactions. In spite of this, circulars relating to the state of the market, with the defendants' business card appearing on the face of the envelope, were received at his office; and, finally, two letters, one acknowledging the receipt of $300 for his account, and one confirming a stop loss order to sell 200 Steel at 71 came there in his absence; and in relation to these last two letters Mitchell wrote the defendants that luckily these letters were forwarded to Carver, who was out of town, without being opened, and stating that he had several times asked both by wire and letter to have Carver's mail sent to Mitchell's office without his name appearing upon

the envelope, Mitchell also adding that Carver's law partner was a strict church man and "does not believe in gambling." It is the fair inference from these and other similar facts contained in the record that the defendants' manager knew that Carver was engaged on a rather large scale in a course of conduct which to all intents and purposes amounted to gambling; that he had no money of his own with which to gamble on such a scale; that he had access to trust funds and securities in the line of his law practice, and that during this period of gambling he was bringing to the defendants moneys and securities in large amounts; and that the moneys and securities to which Carver had access were those in the custody of the law firm of the plaintiffs of which Carver was a member.

The evidence makes it clear that the plaintiffs would not have readmitted Carver into the partnership or retained him there if they had known or had had reasonable grounds to suppose that he had reopened his account with the defendants, and that the embezzlement of the securities was the direct consequence of Carver's operations in that account. The plaintiffs' losses, therefore, seem to be the natural and proximate consequence of Mitchell's fraud and deceit. (*Ehrgott* v. *Mayor, etc.,* 96 N. Y. 264; *Sharon* v. *Mosher,* 17 Barb. 518; *Vandenburgh* v. *Truax,* 4 Den. 464; *Gibney* v. *State,* 137 N. Y. 1; *Guille* v. *Swan,* 19 Johns. 381; *The Normannia,* 62 Fed. Rep. 469; *Jeffrey* v. *Bigelow,* 13 Wend. 518.)

The defendants charged that Deyo wrongfully withheld from Mitchell at the time of the conversation about November 1, 1910, the fact that Carver had already embezzled trust funds from the firm, and that because such information was withheld the plaintiffs should not now be permitted to recover. The theory of this contention is that if the fuller disclosure had been made by Deyo it would have put Mitchell so completely on his guard that he would have been in position to close Carver's account as soon as the first suspicious circumstance occurred which might indicate that Carver was using funds not his own. This consideration becomes important only if it be held that what Deyo did communicate to Mitchell was insufficient to give the defendants notice of what would be likely to happen. But in the light of Deyo's statement the bringing to the

defendants' office by Carver of large amounts of moneys and securities was enough to put the defendants upon inquiry or require them to proceed with his account at their risk. For Carver had lost everything that he and his wife had through stock speculation with the defendants; he had access to large amounts of trust property; it is difficult to conceive what explanation the defendants' manager may have offered to himself of the sources from which these large deposits came. Mere negligence of the plaintiffs in failing to disclose Carver's former larcenies would not defeat this action. (*Eten* v. *Luyster*, 60 N. Y. 252; *Albany City Savings. Inst.* v. *Burdick*, 87 id. 40; *Muller* v. *Rosenblath*, 157 App. Div. 513.) The true test is rather whether enough was said to Mitchell so that the defendants ought reasonably to have contemplated, whether actually contemplated or not, that loss to the plaintiffs would be a natural consequence of Carver's continued operations. The rules the defendants had promulgated for the conduct of their own business were evidently built upon this same principle, for the defendant Hudson testified that if they had grounds of suspicion that a man has been guilty of embezzlements or thefts the account would be ordered closed at once.

Defendants' point that they are not responsible for Mitchell's alleged fraud does not withstand close scrutiny. If he was acting within the actual or apparent scope of his authority the defendants are bound. His business was to procure customers for the defendants, and thereby profits by way of commissions for them. It was, of course, as much his business to hold such customers. The defendants had instructed him to keep the accounts of customers secret. On November 1, 1910, Carver was a customer, but the jury were, under all the circumstances, justified in finding that Mitchell had strong reasons to believe that Carver would not be in a position to continue his trading if he left the law firm, and it was certain he could not continue a member of that firm if the plaintiffs knew he kept on trading. Mitchell's representations were squarely directed to the enhancement of the defendants' gains, and he was apparently clothed with authority to make them, for he was the manager in charge of the local office. He was keeping Carver's business secret.

This brings us to consideration of the question whether the

trial court adopted the proper rule in determining the measure of the plaintiffs' damage. We have examined with care the argument the defendants submit, but are unable to escape the conclusion that there is evidence to support the verdict that the moneys and property were, by Mrs. Carver, the stepmother of the embezzler, and by Mrs. Jackson, as well as by the other clients who suffered, intrusted to the law firm, rather than to Carver individually, and the firm was the bailee. That the plaintiffs have not yet satisfied in full the claims of the bailors does not reduce the liability of the defendants in this case. (*Mechanics & Traders' Bank* v. *F. & M. Nat. Bank*, 60 N. Y. 40; *Dix* v. *Jaquay*, 94 App. Div. 554; *Faulkner* v. *Brown*, 13 Wend. 63.) The defendants will be afforded protection against payment of any of these claims a second time, as in the cases of the actions by clients direct against them. (*Dix* v. *Jaquay*, *supra*, and cases there cited.) The agreements with Deyo Bros. do not operate to reduce the plaintiffs' demand in this action, and they were drawn with the clear intent that they should have no such effect.

In reserving decision on the motion for a nonsuit and direction of a verdict, the court said it would prepare and submit specific questions; this was done so as to make a retrial unnecessary. The trial had occupied three weeks. In this course the parties acquiesced, and the jury rendered a verdict in favor of the plaintiffs for the full amount indicated in the questions submitted.

The order and judgment appealed from should be reversed, with costs, and judgment directed to be entered on the verdict for the aggregate amounts of the several answers, together with interest from December 1, 1912.

All concurred.

Order and judgment reversed, with costs, and judgment directed to be entered on the verdict for the aggregate of the amounts of the several answers, together with interest from December 1, 1912.