THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* S. W. STRAUS & Co., INCORPORATED, and Others, Defendants.*

Supreme Court, Kings County, September 3, 1935.

* See, also, 155 Misc. 610; 156 id. 642; 158 id. 222.

*Nathaniel L. Goldstein* [*Edmund W. Van Voorhis* of counsel], for the receiver.

*Glass & Lynch* [*Simon Brett, Jerome Weinstein* and *Sydney W. Cable* of counsel], for the receivers of S. W. Straus & Co., Incorporated, of Delaware, and for S. W. Straus & Co., of Maryland, and associate counsel with *Newman & Bisco*, for 565 Fifth Avenue Corporation, a creditor.

*Maurice B. & Daniel W. Blumenthal* [*Daniel W. Blumenthal* of counsel], for the Bondholders Protective Committee and various claimants.

Other attorneys appearing for other claimants.

GORDON (HARRY A.), Referee.    This is a reference upon 1,400 claims made against S. W. Straus & Co., Incorporated, in receivership.    In 1882 Frederick W. Straus established the business of selling first mortgages on small improved property in Chicago. In 1895 he was joined by his son, Simon W. Straus, and the firm of S. W. Straus & Co. was organized.    In 1905 the Illinois corporation established a sales office in New York city.    In 1916 S. W. Straus & Co., Incorporated, was organized under the laws of the State of New York.    Having then been in business thirty-four years, it adopted the slogan: " 34 Years in Business Without Loss to Any Investor."    That slogan continued — the number of years annually changing from 34 to 45 — until 1927 when it was discontinued. The legend remained true in fact until February 1, 1931.    Until then there had been no loss to any investor.

In addition to the Illinois and New York corporations, there were organized S. W. Straus & Co., Incorporated, of California, Massachusetts, Pennsylvania, Maryland, and Canada, besides various corporations for special purposes, such as, property management, real estate and insurance business.    S. W. Straus & Co., Incorporated, of Delaware, was the holding company and owned the stocks of these corporations.    It had an authorized capital stock of 1,000,000 shares, the greater part of which was owned by Simon W. Straus and members of his family, including his son-in-law, Herbert S. Martin, who died in 1930; S. J. Tilden Straus, his brother, and Walter S. Klee, his nephew, who died in 1932.    Simon W. Straus died on September 7, 1930.

S. W. Straus & Co., Incorporated, of New York and Illinois, at the time of the receivership, were engaged in the business of underwriting and selling to the public, bonds of third party corporations, in denominations of $100, $500 and $1,000, principally secured by real estate mortgages.    The New York corporation had offices in Albany, New York, Buffalo, Philadelphia, Pittsburg, Boston and other cities.    In addition, the other Straus corporations, exclusive of the Delaware corporation, acted as selling agents in the distribution of these bonds.    The business was dominated by Simon W. Straus.    In 1929 he caused to be organized the Straus National Bank and Trust Company.    It acted as trustee under the bond indentures.    It was merged into The Continental Bank and Trust Company, which became substituted trustee on September 15, 1931.    At the time of the receivership, the principal office of S. W. Straus & Co., Incorporated, of New York, was in the Straus Building, 565 Fifth avenue, New York city, and of Illinois in the Straus Building, Chicago, Ill.    These bonds were sold to the public by about 200 salesmen, at the various offices and by personal solicita-

tion at the homes of investors; about 50 operated from the New York office, and the remainder elsewhere in the United States. In the New York offices alone there were between 200 and 300 employees. These Straus corporations sold to the public in the aggregate one billion dollars par in bonds. On the date of the receivership, March 3, 1933, there were $360,000,000 bonds unpaid, held by 80,000 bondholders. The bonds were acquired by S. W. Straus & Co., Incorporated, at discounts of between ten and twelve per cent and sold to the public at about par. Thus, the gross profit from the sale of these bonds to the Straus Corporations was over $100,000,000. There were large expenses for rent, administration, salaries, advertising, engineering and other items. Besides, S. W. Straus & Co., Incorporated, of New York, derived a revenue from a department which it maintained for the repurchase and resale of bonds, and also from interest earned on its own moneys and those received as fiscal agent. Interest and principal were collected by it under the various bond issues and disbursed among the bondholders.

Up to 1924 S. W. Straus & Co., Incorporated, of New York, sold only first mortgage bonds, except one issue which was secured by the mortgage on the leasehold on the Straus Building, New York. The cost of the building was $2,500,000; the bond issue was $3,000,000. The bonds do not disclose that the fee is not security therefor. The owner of the lease was the 565 Fifth Avenue Corporation. All of its capital stock was owned by S. W. Straus & Co. of Delaware.

After 1924, S. W. Straus & Co., Incorporated, of New York gradually included in its offerings, not only first mortgage bonds, but others secured by second and third mortgages euphemistically called " general mortgages," and collateral trust bonds where the security was a potpourri of indifferent subordinate mortgages owned by the borrower and pledged as security, besides debentures of corporations owning real estate — obligations entirely unsecured. The $3,500,000 Ambassador Hotel six per cent issue is typical of the last class. There were three Ambassador Hotels, one, on Park avenue, New York city, and another, in Atlantic City, together known as the Eastern Ambassador Hotels, and a third, in Los Angeles. There was a first mortgage of $6,000,000 on the Los Angeles hotel. In connection with that mortgage, it was represented that the land and building were valued at approximately $10,000,000, $7,000,000 for the land and $3,000,000 for the building. The land had cost only $300,000; the land and building only $4,100,000; yet the first mortgage was $6,000,000. The two eastern hotels were subject to a first mortgage of $12,000,000. The three hotels thus

incumbered by mortgages aggregating $18,000,000, were conveyed to the Ambassador Hotel Corporation, and S. W. Straus & Co., Incorporated, of New York underwrote and sold to the public $3,500,000 debenture bonds of this corporation which owned only the equity in these three hotels.

During the depression which followed the 1929 crisis, complaints of fraud were made to the Attorney-General of the State of New York. As a result, an investigation was made by him. In September, 1932, an injunction restraining illegal practices under the Martin Act (General Business Law, art. 23-A) was issued and a receiver appointed. The Appellate Division, Second Department, modified, by eliminating the receiver (236 App. Div. 796). Thereafter upon consent of all parties in that action, receivers were appointed, and the corporation is in liquidation.

The present claims, in the main, charge fraud by the salesmen in the sale of these bonds. The Supreme Court has ordered a hearing upon these claims before the referee. The principal defenses urged are on law grounds. After about half of the claims had been heard, counsel for the receivers of S. W. Straus & Co. of *Delaware,* the holding company, who also represent the 565 Fifth Avenue Corporation, the rent creditor, appeared and asserted the right to oppose these claims. If such right exists each of the 1,400 claimants is equally entitled to make defense against the others. The receiver, through his counsel alone, until superseded by another under the court's direction and upon adequate grounds, had the exclusive right to resist these claims. In any event, the intervening counsel by courtesy have been allowed to oppose and have in fact exercised every privilege as though they had defended as of right. In practically all of the cases the testimony of the claimants is unchallenged. In isolated instances the salesmen, charged with the frauds, testified unimpressively and made equivocal denials. The claims were all separately heard. Each must be determined upon its own evidence together with the general data stipulated to apply to all, but without regard to the proof in the other cases. If the claimants had counsel, in support of any single claim, proof of contemporaneous fraud practiced with respect to bonds of the same issue would undoubtedly have been offered. Most of the claimants were without attorney, testified without preparation, and many were subjected to searching cross-examination. This memorandum has been prepared without aid from counsel for claimants.

These counsel for the Delaware corporation asked at the conclusion of the hearings that the claims heard before their inter-

vention be reopened to permit further cross-examination and more elaborate defense. This would have required the recalling of some 400 claimants and extra expense of hearings, which moving counsel refused to bear. Involved in that application is an indirect criticism of the receiver's counsel. In fairness to the latter it may be observed that the principal technical objections were made not by him but by counsel for the Delaware receivers and the 565 Fifth Avenue Corporation, a subsidiary of the Delaware corporation. Their interest was to defeat claims, thereby increasing the distributive share of the latter as creditor, and enhancing the remote chance of a distribution to the former as sole stockholder.

A receiver against whom claims are asserted is not, in respect to defenses, in the same position as a party. His duty is to collect, liquidate and distribute assets. He is required to accept undisputed, to resist unfounded, and to insist on proof of doubtful claims. In the situation here presented, where a large number of claims of fraud were made, it was his duty in the first instance to reject, and put the claimants to their proof and to offer evidence available in defense. It was not his duty to resist meritorious claims, or to attempt to defeat them on technical grounds, particularly where, had there been legal aid, the objections might have been obviated. The receiver and his counsel have conducted themselves throughout in accordance with these standards of duty. They have rendered available the great mass of documents and books, which record these transactions, to the claimants. The contentions to which reference will be made, that the claimants are barred from relief by laches, negligence, by failing to make timely protest, by innocently depositing their bonds with protective committees, by failing to apprise themselves of the contents of form letters, pamphlets and of the bonds themselves, were made principally by intervening counsel. So, too, objection has come from the same source, that the referee has been too helpful to the claimants in the presentation of their proof. The situation compelled the referee to act as the interrogator of those claimants who had no counsel. The grievance is that at times motions to dismiss on technical grounds or for hiatus in proof failed, because the referee brought the legal objections to the claimants' attention in lay words, and afforded opportunity for amplification or explanation. The purpose of a trial is to secure a full disclosure of the facts. The duty of a judicial officer is to assist. The duty grows when either party is under disability. Passivity may be the judicial role when the conditions of legal combat are equal. Active participation when necessary to elicit the truth is the least measure of that duty. Our methods for the adducement of proof are circumscribed

by conditions familiar only to the trained legal mind. When a suitor is cast out of court, not for unmeritorious cause, but because of inadequate advocacy, there is no fair trial. What has been said does not reduce the minimum requirement of law that a claim be proved by a fair preponderance of the credible evidence. The point is that before weighing, a party must have a fair chance to place his evidence in the scales.

Fraud is a personal claim. Representation to be actionable, must be as to matters *in esse*. Opinions, promissory representations, except under special circumstances reflecting concealed intentions, and assurances of safety, are not enough. Falsity of representation alone does not establish a cause of action unless there was inducement and reliance. *Caveat emptor* often stands as a bar to relief. Although S. W. Straus & Co. had through many years of successful operation established a reputation for safe investment and many relied upon them blindly, enough has not been shown, taking the claims separately, to warrant the application of principles obtaining when the relation is of trust and confidence. In some instances the objection is that the fraud was not established by a sufficient weight of evidence, but the principal contention is that rules of law declared in decisions bar recovery on technical grounds.

Concurrently with this memorandum, there is submitted the report upon the claims (not published). The purpose here is to set forth the general contentions made by defending counsel and the principles of law which have been recognized and applied in the disposition of these objections and in the recommendations about to be made.

There is practical unanimity among the claimants that these bonds, in fact secured by subordinate liens or unsecured, were represented to be first mortgage bonds. A very large number of the claimants are women. Among them are teachers, nurses, waitresses, domestics and housewives — in the main, persons inexperienced in business matters and incapable of understanding the intricacies of these mortgage transactions.

In connection with all of these bonds, descriptive circulars were issued, which gave accurate definition of the mortgages which secured them, amply sufficient to advise the experienced and understanding mind of the absence or subordinate character of their security. However, the conclusion is irresistible that as its business grew to include these inferior lien issues, advantage was taken of the reputation which S. W. Straus & Co. had built as a dealer in first mortgage bonds only, and that many of the salesmen, all of whom were compensated on a percentage basis, deliberately misrepresented these issues as first lien bonds. It is inconceivable

that these malpractices continued on so general a scale, without the knowledge and connivance if not by the express authority of the dominating officers of the principal.

In the circulars valuations are placed on the properties by claimed independent appraisers, which gave an appearance of safety to these bonds. The appraisals were at best opinions, paid for by S. W. Straus & Co., Incorporated, or the borrower. Time, while it may not have established their intentional exaggeration when made, has proved that most of these issues are more or less worthless.

An investigation into the affairs of S. W. Straus & Co., Incorporated, of New York, its business methods and practices, the bases upon which the amounts of the mortgages were fixed, the disposition by borrowers of the proceeds of loans intended for real estate improvement, the commissions paid, the good faith and accuracy of the private appraisals, its financial strength, and its financial condition at the time of the receivership and since, was not within the scope of these hearings.

It has developed, however, that aside from these claims, in addition to a few in contract, that S. W. Straus & Co., Incorporated, was without substantial debt at the time of the receivership. It owed approximately $350,000 rent to 565 Fifth Avenue Corporation, which owned the lease and had constructed the building on Fifth avenue in which S. W. Straus & Co., Incorporated, of New York had its office. This building had been leased by that corporation to S. W. Straus & Co., Incorporated, of New York at a rental, including taxes, of about $500,000 a year. There was rent unpaid at the time of the receivership of $350,000, a claim for which was allowed by the receiver. In addition, the receiver accepted a claim for $107,000 in favor of S. W. Straus & Co., Incorporated, of Maryland (upon inter-company matters), the stock of which company is also owned by S. W. Straus & Co., Incorporated, of Delaware. Miscellaneous accepted claims aggregate $40,000, making its total indebtedness about $500,000, besides a liability for taxes to the State of New York for $80,000. On the other hand, at the time of the receivership the books of S. W. Straus & Co., Incorporated, of New York, disclosed nominal assets of $11,000,000, of which about $44,000 was cash. These consist of certificates of deposit, stocks, bonds, coupons, mortgages, claims for advances, and real estate, which the receiver is liquidating, and the value of which is doubtful.

It is not intended to separately analyze the evidence in these fraud cases. Most of these bonds were acquired within the period of five years prior to 1931. First mortgage bonds are not involved. The complaint is limited to the so-called general, leasehold, collateral trust and debenture bonds. The total of the issues with respect

to which individual complaint is made is about $80,150,000. A more detailed description of them will be given. Until 1931 all of these bonds continued to pay interest and principal in accordance with their terms. Defaults commenced in 1931, and by the end of 1932 practically all were in default.

All of these bonds are directly or indirectly secured by subordinate interests in real estate. Carrying charges have not been earned. Prior mortgages are in foreclosure. Underlying leases are being terminated in summary proceedings. Receivers, mortgagees and lessors are in possession. The outlook is that nearly all of the security will be extinguished and many of these bondholders will eventually suffer a total loss. In isolated instances reorganizations have been effected and others are in process. These reorganizations naturally give precedence in security to prior interests. What is left to these bondholders has little more than paper value. The time of reckoning has merely been delayed — the date of loss postponed. No collective effort has been made and no governmental or other financial aid has been offered in the interests of these subordinate liens. Whilst in the aggregate the sum is huge, separately the claims are small compared with the cost of intelligent participation and refinancing, upon reorganization of these large enterprises. The bank or trustee holding the first mortgage, or the lessor owning the fee, who most often are required to make additional investment to clear unpaid taxes, provide for unmade repairs, legal expenses or other capital expenditures, are properly concerned solely about their own security and the application of future revenue towards their principal and interest. There can be no spokesmen for these bondholders in these circumstances. In the barter for the future, those can have no voice whose interests are inferior and who have no share of help to contribute. It is no part of this opinion, yet it may not be irrelevant to observe that with outside aid many of these investments might be at least partially salvaged.

Until 1924 S. W. Straus & Co., Incorporated, of New York had sold first mortgage bonds. It then changed its policy. No claim is made that it actively undertook to communicate this change of policy to the public. True, a study of the circulars and literature issued on the subsequent issues would have disclosed to an understanding mind the subordinate character of these bonds and that there had been this change of policy. These bonds were publicly advertised by circular, radio and through the press. Often, pass books of savings banks were turned over by the investor to the salesman who arranged for the application of the proceeds to the purchase of these bonds. Many of the claimants, as other first

mortgage bonds became due, were solicited to invest the proceeds in these new issues. They testified that they insisted on first-class securities, equal in character to that about to be redeemed, and that it was represented that the new would be of the same "class" as the old.

For the purpose of indicating in a general way the character of these bonds which were sold at practically par, bearing interest on an average slightly in excess of six per cent per annum, with respect to which these fraud claims are asserted, a summary will be given of the more important of these issues.

### 1.

#### $2,500,000 GENERAL MORTGAGE. NORTHEAST CORNER OF FORTY-THIRD STREET AND FIFTH AVENUE.

Bonds — six per cent interest — dated December 27, 1929, secured by second mortgage on the thirty-seven-story office and commercial building at the northeast corner of Forty-third street and Fifth avenue, subject to a first mortgage of $6,000,000 held by the Metropolitan Life Insurance Company, interest five and one-half per cent per annum. The appraised value was $11,000,000. The land is 104 feet on Fifth avenue and 184 feet on Forty-third street.

### 2.

#### $6,500,000 FIRST MORTGAGE LEASEHOLD — CHANIN ISSUE. SOUTHWESTERN CORNER LEXINGTON AVENUE AND FORTY-SECOND STREET.

Bonds — six and one-quarter per cent interest — dated September 15, 1927. Average rent payable under leasehold $315,000 per annum. Improved by fifty-two-story building. Appraised at about $12,000,000. 125 feet wide on Forty-second street and running the entire block on Lexington avenue to Forty-first street.

### 3.

#### $3,000,000 GENERAL MORTGAGE — CHANIN ISSUE. SOUTHWESTERN CORNER LEXINGTON AVENUE AND FORTY-SECOND STREET.

Bonds — six and one-half per cent interest — dated July 25, 1928, secured by a second mortgage on the *leasehold* on the above property, and subject to the above first mortgage of $6,500,000.

### 4.

#### $5,000,000 GENERAL MORTGAGE — CHANIN REALTY CORPORATION ISSUE.

Bonds — interest seven per cent — dated April 1, 1930, secured by a subordinate mortgage on six properties owned by the Chanins as follows:

*First Parcel:* Principal security — the building at the southwest corner of Forty-second street and Lexington avenue constructed on leased ground. Average ground rent $315,000 per annum. Subject to the above first mortgage of $6,500,000 on the leasehold, and the above second mortgage of $3,000,000 on the same leasehold.

*Second Parcel:* Lincoln Hotel — leasehold. Constructed on the east side of Eighth avenue between Forty-fourth and Forty-fifth streets, subject to a first mortgage held by the Metropolitan Life Insurance Company of $3,800,000.

*Third Parcel:* Beacon Hotel and Beacon Theatre, at Broadway and Seventy-fifth street, subject to a first mortgage of $5,250,000.

*Fourth Parcel:* Chanin Building, Brooklyn, leasehold on southeast corner of Court and Schermerhorn streets, six-story store and office building, subject to a first mortgage of $165,000, interest six per cent.

*Fifth Parcel:* Ocean Avenue and Beverly Road Apartments, two six-story apartment buildings, subject to a first mortgage of $659,000, interest six per cent.

*Sixth Parcel:* Bedford Avenue Showrooms, two one-story buildings on Bedford avenue, Brooklyn, subject to a first mortgage of $65,000, interest six per cent.

### 5.

#### $3,500,000 AMBASSADOR HOTEL CORPORATION DEBENTURE.

Debenture bonds, interest six per cent, dated March 1, 1928, wholly unsecured, made by Ambassador Hotels Corporation, owner of three Ambassador hotels, Park avenue, New York city, Atlantic City, N. J., and in Los Angeles, Cal., subject to a first mortgage of $12,000,000 on the eastern hotels, and subject to a first mortgage of $6,000,000 on the Los Angeles hotel, an aggregate of $18,000,000 first mortgages. Privately appraised, land, $12,000,000, and buildings and furnishings, $16,000,000; total, $28,000,000. Of this appraisal, over $7,000,000 is attributed to the land of the Los Angeles hotel, the actual cost of which was less than $300,000.

### 6.

#### $3,500,000 GENERAL MORTGAGE — BRICKEN PROPERTIES.

Bonds, interest six and one-half per cent, dated June 15, 1928, secured by a subordinate mortgage on five parcels of real estate, in which an equity was claimed of $5,520,000 above the first mortgages, as follows:

*First Parcel:* 26 Court street, Brooklyn, subject to a first mortgage of $3,500,000, six per cent, underwritten by S. W. Straus & Co., Incorporated, in 1925.

*Second and Third Parcels:* 230–238 West Thirty-eighth street and 225–235 West Thirty-seventh street, Manhattan. Two seventeen-story business buildings known as the Bricken Arcade, subject to two first mortgages on the respective parcels of $626,500 on one, and $759,000 on other, interest six per cent.

*Fourth Parcel:* Southeast corner of Eighth avenue and Thirty-seventh street, twenty-three-story business building subject to first mortgage of $1,225,000, interest six per cent.

*Fifth Parcel:* 247–263 West Thirty-seventh street, Manhattan, leasehold. Eighteen-story business building claimed to be worth $460,000. Not subject to prior mortgage.

### 7.

### $3,000,000 BARC-RAY HOLDING CORPORATION — COLLATERAL TRUST.

Bonds, interest six and one-half per cent — secured by various second and third mortgages aggregating $4,061,000 on four parcels of real estate as follows:

*First Parcel:* 480 Park avenue, second mortgage, $863,000; subject to first mortgage of $4,600,000.

*Second Parcel:* 42 Broadway, $980,000; subject to various prior mortgages aggregating $5,500,000.

*Third Parcel:* 389 Fifth avenue, second mortgage, $818,000; subject to first mortgage of $1,472,000.

*Fourth Parcel:* Southwest corner of Madison avenue and Thirty-seventh street, third mortgage, $1,400,000; subject to prior mortgages of $1,455,750.

### 8.

### $3,000,000 GENERAL MORTGAGE — 1 WEST FIFTY-SEVENTH STREET

Bonds, interest six per cent — dated December 1, 1928 — secured by a blanket mortgage on six parcels, subject to first mortgages on four.

*First Parcel:* West side block on Fifth avenue between Fifty-seventh and Fifty-eighth streets, consisting of two nine-story and four six-story buildings, subject to first mortgage of $6,000,000.

*Second Parcel:* Northeast corner of Fifty-second street and Fifth avenue, subject to first mortgage of $1,400,000.

*Third Parcel:* 145–147 East Fifty-seventh street. A twelve-story business building 50 x 100, subject to first mortgage of $510,000.

*Fourth Parcel:* Southeast corner of Thirty-fifth street and Eighth avenue, 48 feet wide by 100 feet deep, subject to a first mortgage of $700,000.

*Fifth Parcel:* 54 East Fifty-ninth street, 25 x 100; eight-story

building constructed thereon, claimed to have a value of $200,000, and having no prior mortgage.

*Sixth Parcel:* Southeast corner of Fifty-eighth street and Ninth avenue, 40 feet wide by 100 feet deep. Valued at $400,000, and having no prior mortgage.

### 9.

### $4,000,000 FIRST LEASEHOLD MORTGAGE — MADISON AVENUE AND FIFTY-NINTH STREET.

Bonds — six and one-quarter per cent interest — secured by a first mortgage on leasehold — dated July 1, 1929 — covering the ten-story business and store building on the east side of Madison avenue between Fifty-eighth and Fifty-ninth streets, 200 feet on Madison avenue, 200 feet on East Fifty-ninth street, and 150 feet on East Fifty-eighth street; ground rent payable under the lease $220,000 per annum; total value of the building and leasehold claimed to be $5,750,000.

### 10.

### $1,000,000 SECOND MORTGAGE — NEW YORK ATHLETIC CLUB.

Bonds — seven per cent interest — secured by second mortgage dated December 17, 1928, covering New York Athletic Club House fronting 200 feet on Seventh avenue and 100 feet on both Fifty-eighth and Fifty-ninth streets, New York city, as well as the Travers Island property of the club, 17 acres, subject to a first mortgage of $6,250,000. The valuations placed on this property were $7,250,000 for the clubhouse, $750,000 estimated furnishings, and $1,000,000 for the Travers Island property, a total of $9,000,000, and an equity of $2,750,000 above the first mortgage.

### 11.

### $1,350,000 FIRST MORTGAGE LEASEHOLD — FIFTY-SECOND STREET AND MADISON AVENUE.

Bonds — six per cent interest — secured by mortgage on the leasehold on Fifty-second street and Madison avenue, office building — dated November 20, 1928 — covering the twenty-four-story and penthouse commercial building at the southeast corner of Madison avenue and Fifty-second street, 100 feet on Madison avenue and 125 feet on Fifty-second street, average ground rent about $100,000 per year — subject to a mortgage on the fee of $750,000 required to be paid off by the owner prior to November 1, 1939; valuation placed on leasehold and building $2,225,000.

**12.**

$1,250,000 FIRST MORTGAGE LEASEHOLD — FIFTY-SEVENTH STREET AND MADISON AVENUE.

Bonds — interest six per cent — secured by mortgage on lease-hold, dated January 30, 1925, covering the twenty-story office building at the southwest corner of Fifty-seventh street and Madison avenue, 125 feet on Madison avenue, 47 feet on the south side of Fifty-seventh street with a wing 75 x 25 feet, giving the plot an L shape. Subject to $70,000 mortgage on the land — estimated appraisal, $2,000,000. The rent reserved in the lease is not set forth in the circular.

**13.**

$5,000,000 FIRST MORTGAGE LEASEHOLD — 277 PARK AVENUE.

Bonds — six and one-half per cent interest — secured by mort-gage on leasehold — dated August 14, 1923, on twelve-story apart-ment building on the block bounded by Park and Lexington avenues, Forty-seventh and Forty-eighth streets, leased from the New York Central Railroad Company. The building without the land appraised at $7,150,000 — ground rent $200,000 per annum.

**14.**

$1,850,000 SECOND MORTGAGE — 12 EAST EIGHTY-SIXTH STREET.

Bonds — interest six and one-half per cent — secured by general (second) mortgage, dated May 7, 1926, on the fifteen-story apart-ment hotel and furnishings on the block front on Madison avenue between Eighty-fifth and Eighty-sixth streets; subject to a first mortgage of $3,890,000; land and building appraised at $6,750,000.

**15.**

$2,500,000 SECOND MORTGAGE — 2 PARK AVENUE.

Bonds — six and one-half per cent interest — secured by second mortgage, dated July 15, 1929, on the twenty-eight-story commercial building constructed on the entire block on the west side of Park avenue between Thirty-second and Thirty-third streets; subject to a first mortgage of $6,500,000. Valued at $11,000,000.

**16.**

$500,000 SECOND MORTGAGE — 15 WEST EIGHTY-FIRST STREET.

Bonds — six per cent interest — secured by general (second) mortgage — dated November 1, 1929, on the fifteen-story apart-ment building at 15–23 West Eighty-first street and 18–30 West Eighty-second street, 125 feet on West Eighty-first street and

138 feet on West Eighty-second street, and 204 feet 4 inches deep; subject to a $2,500,000 first mortgage, privately appraised at $3,750,000.

## 17.

#### $600,000 Second and Third Mortgages — New Weston Hotel.

Bonds — seven per cent interest — dated December 1, 1929, secured by a second mortgage on the twenty-one-story hotel building at the southeast corner of Madison avenue and Fiftieth street, 75 feet wide on Fiftieth street and 50 feet on Madison avenue; subject to a first mortgage of $1,090,000; and further secured by a third mortgage on the annex running 50 feet on Fiftieth street and 40 feet on Forty-ninth street, subject to first and second mortgages aggregating $1,529,250. The two parcels privately appraised at $3,900,000, subject to mortgages aggregating $2,619,250, leaving an equity of $1,280,750.

## 18.

#### $600,000 Second Mortgage — Hotel Lexington.

Bonds — seven per cent interest — dated May 1, 1928, secured by a junior participation (second mortgage) in $4,500,000 first mortgage on the twenty-five-story transient hotel building at the southeast corner of Lexington avenue and Forty-eighth street, 100 feet 5 inches on Lexington avenue and 174 feet 6 inches on Forty-eighth street. Estimated private appraisal, $6,000,000.

## 19.

#### $800,000 Second Mortgage — Beacon Hotel and Theatre, 2124–2134 Broadway.

Bonds — six and one-quarter per cent interest — dated April 1, 1928, secured by a junior participation in a consolidated first mortgage of $5,250,000 on the twenty-four-story hotel and separate theatre building on the block front on the south side of Seventy-fifth street between Broadway and Amsterdam avenue, 157 feet on Broadway, 212 feet on Seventy-fifth street, and 150 feet on Amsterdam avenue, subject to the prior interest in said first mortgage of $4,450,000. Private estimated appraisal, $6,700,000.

## 20.

#### $6,000,000 Straus Safe Deposit Company of Chicago, Ill. Debenture.

Bonds — five and one-half per cent interest — dated March 1, 1928 — debenture made by the Straus Safe Deposit Company wholly unsecured. Straus Safe Deposit Company was the owner of the Straus Building at the southwest corner of Michigan and

Jackson boulevards, Chicago, Ill. The building was subject to a first mortgage of $9,000,000. Privately appraised at $20,996,000. This bond issue was not secured by any mortgage on this building. The building is thirty-two stories high, on a plot 161 feet on Michigan boulevard and 171 feet on Jackson boulevard, four stories of which were occupied by S. W. Straus & Co. of Illinois. The remainder of the building was subleased to various tenants.

### 21.
### $500,000 SECOND MORTGAGE — THE BROADMOOR.

Bonds — six and one-half per cent interest — dated October 21, 1926, secured by a general (second) mortgage on the sixteen-story apartment hotel at the northwest corner of Broadway and One Hundred and Second street, 100 feet 11 inches on Broadway and 161 feet on West One Hundred and Second street; subject to a first mortgage of $1,900,000. Privately appraised at $2,850,000.

### 22.
### $750,000 FIRST MORTGAGE LEASEHOLD — 7 EAST FORTY-FOURTH STREET.

Bonds — six and one-half per cent interest — dated September 1, 1926, secured by a mortgage on leasehold, on eighteen-story commercial building, 81 feet wide by 100 feet 5 inches deep, on the north side of Forty-fourth street and east of Fifth avenue. Ground rent about $45,000 per annum. Estimated private appraisal of building and leasehold, $1,200,000.

### 23.
### $100,000 SECOND MORTGAGE — 134 WAVERLY PLACE.

Bonds — six and one-quarter per cent interest — dated April 16, 1928, secured by general (second) mortgage on the sixteen-story apartment building at the southwest corner of Waverly place and Sixth avenue, 102 feet 6 inches on Waverly place and 67 feet on Sixth avenue; subject to a first mortgage of $650,000. Estimated private appraisal, $1,000,000.

### 24.
### $3,000,000 FIRST MORTGAGE LEASEHOLD — STRAUS BUILDING, 565 FIFTH AVENUE.

Bonds — six per cent interest — dated January 1, 1921, secured by the twelve-story office building at the northeast corner of Forty-sixth street and Fifth avenue, 100 feet on Fifth avenue and 180 feet on Forty-sixth street. Represented ground rent, $400,000 (in fact the rent, including taxes, was nearly $500,000); represented value of

leasehold estate, $4,005,800. Bonds on their face are described as first mortgage bonds. There is no reference therein to the fact that the fee is not security therefor. The security has been completely wiped out by dispossess proceedings for non-payment of rent.

### 25.

$300,000 GENERAL MORTGAGE — CENTRAL ZONE BUILDING — FORTY-FIFTH STREET EAST OF SECOND AVENUE.

Bonds — interest six and one-half per cent — dated February 15, 1929, secured by a second mortgage on the twenty-four-story loft and office building on the property on the north side of Forty-fifth street east of Second avenue, 125 feet wide running through the block, a distance of 200 feet to the south side of East Forty-sixth street; subject to a first mortgage of $2,000,000. Appraised at $3,000,000.

### 26.

$2,800,000 FIRST MORTGAGE LEASEHOLD — 80 BROAD STREET.

Bonds, interest six and one-half per cent — dated March 1, 1930, secured by mortgage on the leasehold on thirty-three-story office building — plot approximately 130 feet on Broad street, depth 105 feet on the north line and 96 feet on the south line. Ground rent about $110,000. Privately appraised, $4,235,000.

### 27.

$5,250,000 FIRST MORTGAGE LEASEHOLD — ONE LA SALLE STREET, CHICAGO, ILLINOIS.

Bonds — interest six per cent — dated December 1, 1928, secured by mortgage on leasehold on forty-seven-story office building. Ground rent not stated in prospectus. Estimated private appraisal, $6,867,160 for building.

### 28.

$1,000,000 COLLATERAL TRUST OF UNITED STATES BOND AND MORTGAGE CORPORATION.

Bonds — six and one-half per cent interest — dated July 15, 1928, secured by a pledge of practically all second mortgages aggregating the face amount of $1,250,000.

Claims were also asserted in connection with the $6,500,000 mortgage on the leasehold on Hotel Pierre, and $4,500,000 mortgage on the leasehold on the Squibb Building, to the financing of which it is not necessary to refer, because after default, reorganizations were effected in which practically all of the claimants participated.

A preliminary question presented is as to the rights of claimants to prove claims after the time limited by the order of this court. Pursuant to a court order, notice by publication was given by the receiver to creditors to make proof of their demands by a day certain. (General Corporation Law, § 174.) September 5, 1934, was fixed by the last order of this court as the last day for filing of claims. The first order appointing the referee to hear these claims was entered on February 16, 1934. Contests produced delay. The hearings commenced on November 14, 1934. Numerous claims had been filed after September 5, 1934, and on November 21, 1934, an order was made extending the reference to those claims.

Since the entry of the last order a large number of claims have been filed with the receiver. All claims filed up to March 31, 1935, have been heard without prejudice to the rights of the receiver to urge their late filing. Section 174 of the General Corporation Law provides that notice by publication shall be given to creditors to make proof of their claims by a day specified. There is no provision working a forfeiture for failure to file claims within the time specified. A contrary intent is indicated. Section 182 provides that a creditor who has failed to file his claim before a first dividend, who proves it before the final dividend, shall receive the sum he would have been entitled to on the first dividend before any distribution shall be made to other creditors. Section 187 provides that a receiver is not answerable to any creditor unless the claim is proved before the final dividend. Naturally where distribution is made, an unknown creditor may not complain. Here, no distribution has been made. The question is whether in the absence of statutory power the court may limit the rights of creditors to assert claims; to a period less than that fixed by the general Statutes of Limitation. In the absence of express statutory provision limiting the time of creditors to assert their claims, the provisions of the Civil Practice Act apply. Section 48 of the Civil Practice Act fixes six years, from the date of discovery of fraud, as the period within which an action may be brought. All of the claims here asserted were filed within that period. To remove all question it may be advisable that a further order be entered, *nunc pro tunc*, enlarging the time to file claims to include the period during which the hearings were had and extending this reference to those so filed.

There is yet another phase of the same question. The duty of the receiver is to distribute the assets. Necessarily, a time must come for report and determination upon disputed claims. Orderly administration required that, as the reference proceeded to a close, a time limit be fixed for the filing of claims; otherwise the reference might continue indefinitely. Accordingly, on March 19, 1935,

a direction was made by the referee that the last day for the filing of claims be March 30, 1935. No claims filed thereafter have been heard. A list of those is submitted to the court with the report.

Other questions relating to the proper parties to assert claims in fraud must be considered. Under varying conditions certain of the purchasers disposed of their bonds. In some instances, the original purchasers, intending gifts, paid the consideration and arranged for the delivery, in the first instance, of the bonds to the donees; the latter have asserted claims in fraud. There the right of the donees to claim either on rescission or in deceit is clear. The original transaction will be deemed to have been made with the donee as purchaser, the donor acting as agent. The problem is complicated when the transfer is made *inter vivos*, after the purchase, either for value or as a gift. Then the transferee is without claim. He paid no consideration to be recovered on rescission. The transfer of chattels does not carry with it a claim for damages in deceit. On the other hand, the original purchaser may then recover damages in deceit notwithstanding the transfer. His right to rescind is lost. These principles are limited to absolute transfers. Where the transfers are as a pledge or security and the beneficial interest is reserved to the original holder, his right to rescind or claim in deceit endures. So, the deposit of the bonds by a claimant with the various protective committees, even after discovery of the fraud, did not of itself divest him of the right to rescind, regardless of the form of the agreement under which the deposit was made, because the bondholder in fact retained the beneficial ownership. This is entirely aside from the question of whether such deposit, after knowledge of the fraud practiced, was not such an act of ratification as to bar a subsequent election to rescind. (See *Dennin* v. *Powers*, 96 Misc. 252; affd., *sub nom. Dennin* v. *Finucane*, 176 App. Div. 946; affd., 227 N. Y. 606.)

That question must be determined by the situation at the time and the relationship of the parties. The transfer in itself may not be conclusive.

In some cases the change of ownership of the bonds occurred through bequest or upon intestacy, upon the death of the original holder, upon whom the fraud was practiced. There can be no question of the right of the personal representative of the deceased to claim either on rescission or in deceit. (See Dec. Est. Law, § 120.)

Legatees have asserted the right to rescind and recover the original consideration paid. Whilst no fraud was practiced on them and the consideration was paid by others, and the right to rescind is generally regarded as personal to the party defrauded, yet in a

sense, particularly where there are close family ties, such as that of parent 'and child or brother and sister, and especially where the legacy is of the residue of the estate — situations here presented by the evidence — the legatees may be treated as asserting the rights of the deceased, *eo nomine*, and should be permitted to disaffirm and reclaim the consideration. It will be presumed that had the deceased discovered the fraud, he would have elected to disclaim rather than ratify. By reason of the fraud the value of the bequest is impaired, and those upon whom title devolves should be accorded the rights of the deceased. In conclusion, it may be observed that hardship may result from the disallowance of claims where a transfer was made by one member of the family to another during lifetime, or by an aged parent to a child in contemplation of death or to provide a fund for the support of the former. The claim in deceit is not thereby extinguished. Its practical value, in the light of the special circumstances of these cases, and the difficulty of proof of damage, may not be considered. But such transactions are not distinguishable in law from ordinary sales. A rule which would permit an ultimate holder of chattels to recover the consideration paid by the original purchaser, on the ground of fraud, would not be founded on reason or justice. It would deny the original holder the right to recover damages in deceit, yet presumably that was reflected in the sale price when he disposed of the property. Besides, it would confer attributes on personal property on transfers, unknown to the law. Warranties of quality do not pass with the title. The taint of fraud can have no greater vitality.

Most of the claimants offered only their own testimony in support of their claims. It has been earnestly urged in opposition, with respect to a large number of them, that the evidence is not of sufficient weight to support a finding of fraud. Familiar legal principles are urged as grounds for dismissal. It is argued that fraud claims must be established by clear and convincing proof — that where the evidence is as consistent with innocence as guilt, the courts must adopt the former inference — that fraud will not be presumed, but must be expressly proved. These principles are well recognized. Their application is often difficult. In a civil action a fact may be established by the testimony of a single witness. Whilst in determining the credibility of a witness his interest must be taken into consideration, it is not permitted to the trier of the facts to arbitrarily disregard the undisputed, uncontradicted and unimpeached testimony of even an interested witness. (*Hull* v. *Littauer*, 162 N. Y. 569; *Chapin-Owen Co., Inc.*, v. *Yeoman*, 233 App. Div. 492; *Powers* v. *Wilson*, 203 id. 232.)

Courts have not yet formulated a precise definition of fraud. In a general way it is synonymous with overreaching — the taking of an unfair advantage. It is something which is wrong and which would have defeated the bargain if it had not been practiced.

As was said in *People* v. *Rice* (221 App. Div. 443): " ' One's sense of right and wrong is a safe guide as to what constitutes decent, honorable conduct.' "

It must be determined in the light of the facts in each case, the intelligence, understanding and relationship of the parties, and from what each of the parties must have assumed that the other understood the transaction to be. A pertinent question here is: Did these salesmen know that the customers believed they were buying first mortgage bonds?

Fraud may arise from words or conduct. A written record is rarely available. It may be established without proof of a single word spoken. One accustomed to buy particular wares may assume that a present delivery conforms to past usage. A representation to that effect will be implied. In some of the cases the evidence is meager but the implications many. The age, appearance, calling, the source of the moneys invested — often the savings of a life of manual toil — point the way to the trier of the facts in the search for the truth. The aged charwoman, unlettered, needs no corroboration when she asserts that she intended no speculative investment with the funds slowly accumulated for old age. Fraud may arise from concealment as from affirmation.

Here the proof is that in some instances there was express representation that what was sold was a first mortgage bond. In other instances, persons, accustomed in the past to purchase such bonds, sought further investment asking only for " safe " or " first-class security," or bought without specification. They received these subordinate bonds without disclosure of their true character and accepted them in the belief that the new was as good as the old. In some cases a person whose very appearance and calling indicated his lack of understanding and the reliance which he placed upon the seller, was sold bonds which he was led to believe were safe investments but which in fact were highly speculative, at approximately par, a price paid for prime investments. Ofttimes partial information was conveyed to the prospective investor, which to the experienced mind would have been illuminating, but which in the circumstances left him in the dark. In practically all of the cases heard there is no factual denial of the practices charged. In each case it becomes necessary to determine whether fraud was proved. The conclusion is irresistible that deception was practiced

in many cases, by deliberate misrepresentation, by partial communication of information which did not inform, or by the deliberate concealment of facts.

Many of the claimants testified that at the time of the sale of these bonds no circular descriptive of the security was exhibited. Others admitted that circulars were shown, often retained, but were either not read, or because of their intricacy were incompletely understood.

Opposing counsel contend that the initial " negligence " of the claimants in relying on the salesmen's representations, in failing to read the circulars and advertisements when there was opportunity, and so termed " laches " in failing to make timely discovery of the fraud, is a bar to these claims. Even in the case of a written contract, a party may be relieved upon oral proof that he was misled into believing that the writing embraced an oral agreement. Negligence in failing to examine is no defense. A party defrauded is not held to any " duty of vigilant effort to discover the falsity " of representations. (*Wilcox* v. *American Telephone & Tel. Co.*, 176 N. Y. 115; *Wiesenthal* v. *Krane*, 226 App. Div. 82; *Electrical Audit & R. Co.* v. *Greenberg*, 56 Misc. 514; *Deyo* v. *Hudson*, 174 App. Div. 746; *Muller* v. *Rosenblath*, 157 id. 513.)

The fact that many of the claimants failed to examine the bonds which they received, that an examination of the bonds would have disclosed at least partial information that there was deception, does not militate against these claims.

In the case of *Wilcox* v. *American Telephone & Tel. Co.* (*supra*), CULLEN, J. (at p. 117, quoting from *Albany City Savings Institution* v. *Burdick*, 87 N. Y. 40), says " ' It is certainly not just that one who has perpetrated a fraud should be permitted to say to the party defrauded when he demands relief that he ought not to have believed or trusted him * * * where one sues another for a positive, willful wrong or fraud, negligence by which the party injured exposed himself to the wrong or fraud will not bar relief.' "

The court there held that this rule applies without regard to whether there is a relationship of trust or confidence between the parties.

In the case of *Muller* v. *Rosenblath* (*supra*, at p. 518) language peculiarly applicable was used by JENKS, P. J., as follows: " Even if the plaintiff could have read the mortgage and did not, and that omission with the other circumstances constituted negligence, in that he should not have relied upon Hald * * *, nevertheless his negligence would not have defeated his right to relief if the defendants were guilty of positive, willful fraud."

The rule applies as well to the alleged negligence in failing to subsequently discover the fraud as to the original fraud. The

motions to dismiss, on the ground that when the defaults occurred under the bonds the holders were under an active duty of inquiry, which if made would have disclosed the falsity of the representations, and that the right to rescind has been lost by lapse of time, must fail. This is aside the question whether reasonable inquiry would have uncovered to the lay and inexperienced mind the true facts and their meaning, in these complicated transactions.

The contention is made that, regardless of the initial fraud, many of the claimants are barred from rescinding by their inaction, after a full or partial discovery of the misrepresentations, and are limited to a claim for damages in deceit. This contention necessitates a consideration of certain elementary principles in the law of fraud. It is a familiar doctrine that where a party has been defrauded, he may, upon discovery of the fraud, rescind and recover the consideration paid, or retain what he has received and recover damages in deceit. He cannot do both. (*Clark* v. *Kirby*, 243 N. Y. 295; *Brennan* v. *National Equitable Investment Co.*, 247 id. 486; *Vail* v. *Reynolds*, 118 id. 297; *Davis* v. *Rosenzweig Realty Co.*, 192 id. 128; *Weigel* v. *Cook*, 237 id. 136.)

Whilst the action based on recission may proceed on various grounds, such as failure of consideration, or fraud, or total inability to perform, or repudiation, or such breach as substantially defeats its purpose (*Callanan* v. *K., A. C. & L. C. R. R. Co.*, 199 N. Y. 268), a party may not join in a single action a demand for breach of contract and damages for fraud in its inducement, or for recovery of the consideration on like ground. (*Hunt* v. *Armstrong*, 166 App. Div. 311; *Kranz* v. *Lewis*, 115 id. 106; *Realty Transfer Co.* v. *Cohn, etc., Co.*, 60 Misc. 623; *Edison E. I. Co.* v. *Kalbfleisch Co.*, 127 App. Div. 298.)

Where the election is to rescind, only the consideration is recoverable. (*Weigel* v. *Cook*, 237 N. Y. 136.)

Practically all of the claims here proceeded upon the theory of rescission. A question is presented as to the proper measure of recovery, in view of the contention of the Delaware receivers that the claims should be computed upon a basis which in most of the cases would result in the denial of all relief. Most of the bonds which are the subject of these claims were acquired within the five-year period preceding 1931, when the defaults commenced. These were bonds of third parties which S. W. Straus & Co. sold to the public. In connection with the payment of interest and principal it acted as fiscal agent, collected from the obligors and disbursed among the bondholders. In all cases, interest had been received, at six per cent per annum or more, up to the time of the default. The claimants ask that their claims be allowed in an

amount equal to the consideration paid, with interest at six per cent per annum from the date of payment, diminished by the total interest received by them. The same result is accomplished by merely deducting from the consideration paid an amount equal to the excess of interest received over the legal rate of six per cent. A person paying $1,000 for a bond and receiving two years' interest at seven per cent per annum, had received $140 interest. Deducting the legal interest to which he became entitled, $120, the claim is for $1,000 less $20 excess interest, to wit, $980. With respect to bonds bearing interest at six per cent, the claim has been proved only in the amount of the investment, the interest received balancing the interest payable. Strictly, the claims should bear interest up to the date of the receivership, but for practical purposes the claimants waived interest from the time of the last payment.

On the other hand, the Delaware receivers contend that upon rescission it is the duty of the party defrauded to restore all the benefits of the transaction, namely, the bonds and all interest received. The question whether the acceptance of interest after discovery of the fraud evidences an election to waive the right to rescind will later be considered. Those receivers argue that the claim should be allowed in an amount equal to the consideration paid, with interest, upon condition that the claimant surrender the bonds and tender all interest received, or for purposes of convenience, that the interest so received should be deducted from the distributive share payable upon the claim. Such a course would in effect deny relief to a majority of the claimants. Assuming a distribution of fifteen per cent, the holder of a $1,000 bond, who had received interest at six per cent for three years, would have a claim for $1,000 principal and $180 interest, $1,180. His fifteen per cent distributive share would be $177, and deducting that from the $180, interest received, the balance would be $3. The Delaware receivers contend that unless his theory of damage is adopted, there will be inequality in the percentage of loss sustained by the various investors in the same bonds, dependent upon the period during which the bonds were held; that those who held their bonds longest and, therefore, received most interest, will have sustained a smaller per cent loss on their investment. This argument overlooks, *first*, that the interest was not paid by and did not reduce the assets of S. W. Straus & Co., Incorporated; *second*, that the problem is one of equitable distribution of the assets of an insolvent corporation and not of equalizing the losses of investors. The court is not concerned with the per cent loss which the claimants sustained. Its duty is to equitably distribute the proceeds of the liquidation among those entitled. Accordingly, the claimants' theory of damage is accepted and embodied in the recommendations.

Next comes the principal contention that the conduct of the various claimants after the defaults under the bonds precludes them from claiming on rescission. By the end of 1932, practically all of the bonds under consideration had defaulted in payment of interest. The evidence is that, under varying conditions, some of the claimants took no steps, and made no inquiry as to either the cause of the defaults or the character of the bonds. The vast majority, however, made inquiry from S. W. Straus & Co., Incorporated; some received partial and others full information as to the character of their bonds. Some did not learn of the true nature of the securities until after the receivership in March, 1933. As to them, there having been no discovery of the fraud until after the appointment of the receiver, no contention is made that upon them rested any onus of declaring on rescission and tendering their bonds. Still others were unaware of the fraud until these hearings began. A small number formally rescinded and tendered their bonds.

Did the conduct of those who knew, in whole or in part, that a fraud had been practiced upon them, as early as 1931, deprive them of their right to rescind, is the substantial question presented for decision. The claim is also made that the acceptance and retention of the interest on these bonds, in some instances after the discovery of the fraud, was such an exercise of dominion as to preclude later rescission. The law is well established that a party defrauded may accept without impairing his right to rescind and is excused from tendering back money or benefit received under a contract, where that which was received was retainable, irrespective of the outcome of the claim. (3 Williston Cont. § 1530; *Brocklehurst & Potter Co.* v. *Marsch*, 225 Mass. 3; 113 N. E. 646; *Kley* v. *Healy*, 127 N. Y. 555.)

The interest which these claimants received under these various bonds was paid by the obligors, third parties, and the claimants were in any event entitled to retain it. As has been pointed out, the interest received must be considered in mitigation of damage.

The evidence discloses that immediately after the defaults commenced, S. W. Straus & Co., Incorporated, caused to be organized protective bondholders committees for the various issues. These committees consisted of Nicholas Roberts, president of S. W. Straus & Co., Incorporated, and all of their remaining members were officers and employees of S. W. Straus & Co., Incorporated. The Continental Bank and Trust Company, into which the Straus National Bank and Trust Company was merged, was designated as the depositary of these bonds. Letters were written by S. W. Straus & Co., Incorporated, to the bondholders requesting a deposit

of the bonds with these protective committees. In most instances the claimants made such deposits, and upon the hearings produced as evidence of their bond ownership these certificates of deposit issued by The Continental Bank and Trust Company and other depositary banks. It is contended that the deposit of these bonds, particularly by those who had learned in whole or in part of the fraud, was the exercise of control, inconsistent with the rights here asserted to claim back the consideration. On the other hand, it is the contention of the claimants that because S. W. Straus & Co., Incorporated, had solicited the deposit of these bonds with the committees, and that the committees were their creatures, that such deposits were made to protect their property pending a determination of their rights; that many of the depositors were led to believe that the deposit was but a step towards expected rehabilitation of their investments, that any inference of ratification is dispelled. The law requires that a rescission to be effective must be made " without unreasonable delay." (*Schenck* v. *State Line Tel. Co.*, 238 N. Y. 308; *Schiffer* v. *Dietz*, 83 id. 300; *Shappirio* v. *Goldberg*, 192 U. S. 232.)

What is unreasonable delay must be determined from surrounding circumstances. The rule that a party must disaffirm promptly upon the discovery of fraud is subject to variation. The discovery may be partial. The injured party, because of intricacy, or his own ignorance or lack of experience, may not appreciate the full meaning of information which to an enlightened mind might bring notice of the fraud. The right to rescind may be held in abeyance by promises of settlement or the undoing of the wrong by the wrongdoer. The conduct of the wrongdoer may lull the defrauded party into inaction or lead him to the very course which ordinarily would prove ratification. (See *Brennan* v. *National Equitable Investment Co.*, 247 N. Y. 486; *Shoenbrun* v. *Tubby*, 222 App. Div. 56; *Weigel* v. *Cook*, 193 id. 520; modfd. and affd., 237 N. Y. 136; *Continental Ins. Co.* v. *Equitable Trust Co.*, 135 Misc. 851.)

In the case of *Shoenbrun* v. *Tubby* (*supra*) it was held that a purchaser of stock who was induced to buy by fraud and who after disaffirmance had voted on the stock and was elected a director, was not barred from recovering on rescission, that his conduct was consistent with his right " to protect and preserve the property without losing his right to rescind."

In the case of *Weigel* v. *Cook* (*supra*) the Court of Appeals says: " We take it that the doctrine of election is one of substance and not of mere words. Using the property may or may not be a ratification of the contract according to the circumstances. When it appears that the acts performed are inconsistent with the claim of

repudiation, then, and then only, can there be an election to confirm and adopt the contract. A particular act for which an authority may be cited as indicating an adoption of a contract may under other circumstances have no such force and effect."

Besides, the evidence indicates that in many cases the claimants, while they were vaguely advised that the bonds which they held were not first mortgage bonds, were led to believe, even after default, that what they had was the equivalent. Only in isolated cases did the full extent of the deception become known to the claimants before the receivership.

In this connection, it must be considered that in the spring of 1932 investigations were pending and examinations were conducted by the Attorney-General. In September, 1932, an injunction was granted restraining practices under the Martin Act and receivers appointed. Owing to the reputation which S. W. Straus & Co., Incorporated, had built, its record of no loss to a single investor since 1882, it was not unreasonable that those who had been imposed upon and induced to buy these inferior bonds, and who at best were able to secure only partial information as to the nature of their bonds and none as to the financial status of S. W. Straus & Co., Incorporated, and their future plans looking to indemnity, should have awaited developments and not have taken formal action in disaffirmance of their purchases. In determining the question of whether or not these claimants will be held to have ratified their purchases, as a matter of law, the fact that they did not have the benefit of counsel must also be taken into account. To hold that this great mass of the public who held these bonds are barred from relief upon any theory that they in fact understood the situation and deliberately elected to hold rather than disaffirm, would be an assumption contrary to the fact and an arbitrary denial of justice. The fact is, that nearly all lacked full knowledge of the fraud until after the receivership. The remaining few, while they may have had the intelligence and understanding of the situation, were lulled into a waiting posture by the conduct of S. W. Straus & Co., Incorporated.

Mere inaction, while it may be evidence of ratification and an intent to retain the thing purchased and claim only damages, is not conclusive.

The language of CARDOZO, J., in *Schenck* v. *State Line Telephone Co.* (238 N. Y. 308) is applicable. " The plaintiff is not charged to have signified a will to ratify except by signifying a will to sue. He is not charged to have evinced a readiness that the transaction should be allowed to stand except in conjunction with a demand that damages be paid, and upon the tacit but implied condition that the demand should be obeyed."

In that case the plaintiff was allowed to rescind after he brought an action for damages in deceit, which in fact was barred by the Statute of Limitations.

In the case of *Clark* v. *Kirby* (243 N. Y. 295) Judge CRANE says: " The election of remedies is largely a rule of policy to prevent vexatious litigation, and like the Statute of Limitations is somewhat arbitrary. In this State we say that where a party, knowing all the facts, elects to sue in rescission instead of for damages, he must pursue the course he has taken. Even then, if the remedy chosen be insufficient or inadequate or useless, the rule has not barred the plaintiff from taking other timely methods to obtain his rights." (See, also, *Urdang* v. *Posner*, 220 App. Div. 609.)

Besides, even assuming a deliberate election, after the discovery of the fraud, equity has power " to give relief against a ratification by conduct that is merely thoughtless or inadvertent." (See concurring opinion of CARDOZO, Ch. J., and cases there cited in *Brennan* v. *National Equitable Investment Co.*, 247 N. Y. 486, 492.)

In the judgment of the writer it is unnecessary to sustain a finding that the claimants' rescission is in time, to resort to the equity side of the court for relief from an inadvertent election. Taking into account all the facts and varying circumstances which developed in this bewildering and complex situation, it cannot be said, as a matter of law, that an unreasonable period had elapsed between the time when the claimants discovered the fraud and the receivership. As a matter of fact, in the light of the circumstances then existing, formal rescission thereafter would have been timely. Concededly no formal action was thereafter required. The conclusion reached is fortified by the fact that if the claims in rescission are disallowed on the technical grounds urged, the claimants will be without relief. As has been pointed out in a separate memorandum (*People* v. *Straus & Co., Inc.* [*Feltham* v. *Schultze*], 156 Misc. 642), claims in deceit here are of doubtful value in view of the measure of damages there applicable, which limits the recovery to the difference between what was paid and the market value of that which was purchased at the date of acquisition. (See *Reno* v. *Bull*, 226 N. Y. 546.)

At the time of purchases there was an active market in these bonds at the very prices paid therefor by the claimants. Besides, even if the damage be assumed to be as of the date of the receivership, the market then was so demoralized that proof of value is not available. The conclusion is reached that except in those cases where the evidence is, that after full discovery of the fraud, the claimants indicated by word or conduct a determination to retain their bonds, the right to rescind was not lost through either the

failure on the part of claimants to take action or the deposit of their bonds with the protective committees.

The Delaware receivers' argument that S. W. Straus & Co., Incorporated, may not be charged for the fraud of its salesmen without proof of express authority, is entitled to but passing comment. For the fraud of an agent, unauthorized or even prohibited by the principal, the aggrieved party may rescind and recover the consideration. The rule is otherwise where the injured party seeks damages in deceit from the principal. Then it must be shown that the representation was within the scope of and incidental to the employment. (See *Friedman* v. *N. Y. Telephone Co.*, 256 N. Y. 392; *Harriss* v. *Tams*, 258 id. 229; *Deyo* v. *Hudson*, 225 id. 602; *Matter of Clark*, 233 App. Div. 487; *Spinner* v. *Bergen Associates, Inc.*, 237 id. 610.)

Another theory of liability is asserted by some claimants. The testimony is that promises were at times orally made by the salesmen that S. W. Straus & Co., Incorporated, would repurchase the bonds upon demand at a small discount. In the development of its business, S. W. Straus & Co., Incorporated, established a department through which bondholders might dispose of their bonds before maturity at market prices. Aside from the question as to the authority of the salesmen to make these repurchase agreements, and it is significant that no such obligation is assumed in any of the literature, a careful examination of the evidence leads to the conclusion that this branch of the business, although it may have resulted in profit, was largely for the accommodation of the customers, that this service was to give liquidity to the investment which otherwise would have been frozen, that the undertaking by S. W. Straus & Co., Incorporated, did not measure up to a contract liability to repurchase on demand, but rather that implied in the proposal was the condition that normal conditions would continue, that there would be buyers and sellers of these bonds, and that S. W. Straus & Co., Incorporated, would in such event be the vehicle through which such sales might be effected. These general observations are not intended to embrace any special and deliberate contract imposing fixed obligations to repurchase. Even then, a problem is involved as to the applicable measure of damage and the impracticability of proof of value.

Another question presented relates to the value of certain evidence made admissible by statute. In defense, a witness was called, formerly in the employ of S. W. Straus & Co., upon whose testimony were admitted in evidence certain circular letters sent to different groups of bondholders. It is sought to charge the claimants with notice of their contents, notwithstanding their testi-

mony that they were not received. These letters were mailed by other employees, under the witness' direction, from so-called Holerith cards which held a record of the names and addresses of the various bondholders. As defaults occurred, and protective committees were organized, the bondholders were so advised and requested to deposit their bonds. It is argued that by references in the letters the claimants were put on notice of the subordinate character of their bonds. The witness had no personal knowledge of the mailing. Her records are founded on hearsay. It is contended that the statute gives probative value to the contents of the letters. The statute itself declares differently. It is provided in section 374-a of the Civil Practice Act (Laws of 1928, chap. 532) that "All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but shall not affect its admissibility." By statute the old shop rule of *Vosburgh* v. *Thayer* (12 Johns. 461) has given way to less stringent requirements. The statute gives competency as evidence, to regular records in business, without the preliminary proof before required. Materiality and relevancy are not added. The statute does not give evidentiary worth to what before was without probative value. The record once admitted may itself prove its contents because the facts were known to the entrant. So, too, the entry may serve as a connecting link to make other evidence probative. It may acquire value through other testimony that the information which it contains is accurate. Where a person familiar with the facts reports to another, who makes entry, the record may establish the facts, although memory of the occurrence is gone. In itself the record can have no greater value than would have been the testimony of the entrant. Had the witness here testified at the time of the entry, her evidence would not have warranted charging the bondholders with the receipt of these letters. Aside from the question whether in the absence of denial, sufficient appears to raise an inference of mailing, such inference cannot weigh as evidence against the positive claim of non-receipt.

So, too, in support of certain claims for damages in deceit, and as proof of market value, there were received in evidence periodicals, giving reports of bid and asked quotations of certain bonds, in the over-the-counter market. These pamphlets were admissible under section 375-a of the Civil Practice Act (Laws of 1934, chap. 324). This section likewise provides that "The circumstances of the preparation of such a report may be shown to affect its weight, but they shall not affect its admissibility." Here again the reports can have no greater factual worth than the testimony of those who prepared

them. These were not records or reports of actual sales, but of quotations of bid and asked prices, gathered among brokers solely for information purposes. Alone, they do not prove market value.

Certain claims in contract involving doctrines peculiar require special comment. S. W. Straus & Co., Incorporated, defaulted in the payment of a balance of a subscription to the Beth Israel Hospital building fund. Such claims are ordinarily enforcible. ( *Keuka College* v. *Ray*, 167 N. Y. 96; *Locke* v. *Taylor*, 161 App. Div. 44; *Russian Symphony Society, Inc.*, v. *Holstein*, 199 id. 353; *Allegheny College* v. *National Chautauqua Co. Bank*, 246 N. Y. 369.)

The defense here is *ultra vires*. It is said that a business corporation may not be held to its promise to do charity. Whether without more this legal proposition is sound, is not presented for decision. S. W. Straus & Co., Incorporated, expended large sums in the general advertising of its business through booklets, newspapers, the radio and other channels. Its purpose was to enlarge its business and to add to its good will. A subscription to serve the public whose good will and patronage the subscriber sought, is well within its legitimate powers. Clearly, the object was to serve the business of S. W. Straus & Co., Incorporated, not to satisfy a charitable instinct. The question is not one of provident expense but of power. The subscription was not so foreign to its general purposes as to be condemned as unlawful.

Other claims involve the right to recover unexpended balances of deposits, made by the obligors of bonds with S. W. Straus & Co., Incorporated, for the purpose of reimbursing bondholders for the Federal normal income tax payable upon the interest received under the bonds. The claim of Devoe & Raynolds Company, Inc., is illustrative. S. W. Straus & Co., Incorporated, underwrote and sold to the public a $350,000 bond issue made by the claimant, dated October 26, 1917, payable in ten years, secured by a trust mortgage on real property. The obligor agreed to pay principal, interest and four per cent Federal normal income tax payable by the bondholders on the interest. S. W. Straus & Co., Incorporated, was designated as fiscal agent. At fixed times the obligor was required to deposit with the fiscal agent an amount equal to such income taxes. The fiscal agent was to receive the money as debtor. It is conceded that no trust was intended. The trust agreement reads that " the unused balance, if any, remaining out of such income tax reimbursement fund shall be repaid to the Company (obligor) as soon as this balance is ascertained." The claimant made the required payments into the income tax fund and the Straus Corporation reimbursed those bondholders making claim. The bonds were paid and the mortgage discharged on May 1, 1923 — before

maturity. At the end of that year there was an unexpended balance in this fund of $2,326.42. By the end of 1924 it was $2,203.01, when this account was closed on the books of S. W. Straus & Co., Incorporated, and the balance transferred to profit and loss. The claim for this undisbursed balance was first asserted against S. W. Straus & Co. on February 20, 1933, and was filed against the receiver on February 14, 1935.

Two questions are presented, *first*, whether any cause of action has been proved, and *second*, whether it is barred by the Statute of Limitations. The trust indenture provides that " as each of said deposits shall be made  *  *  *  the liability of the Company (the obligor) to pay  *  *  *  income taxes intended to be covered by such deposit shall be discharged and the holders of the bonds  *  *  *  shall look  *  *  *  for reimbursement of their normal income tax payments, if any, solely to S. W. Straus & Co., Incorporated  *  *  *  and shall cease to be entitled to any benefits under this indenture on account of said bonds or coupons to the extent of the particular payment." Thus, upon the deposit of these moneys by the obligor, S. W. Straus & Co. became obligated to the holders of the bonds to make reimbursement for such income tax payments. Not until S. W. Straus & Co. would be discharged from this obligation could the " unused balance " be " ascertained " and not until then could the obligor have any claim. All the deposits were made prior to May, 1923, when the bonds were paid. It is argued that from the lapse of time alone it will be presumed that those bondholders having claims for reimbursement have asserted them and collected. Outstanding enforcible claims by bondholders there may be arising either from voluntary delayed payment of taxes or government assessment, within a period of six years before the present claim was asserted. It is not necessary to decide whether the rights of the bondholders to reimbursement rest upon a specialty, which would extend their time to make claim to twenty years. It is sufficient that the fiscal agent may be subjected to double liability if the present claim is allowed. Even with respect to those claims of bondholders already barred, the claimant has no standing here. The obligor of the bonds cannot predicate its cause of action on the Statute of Limitations which S. W. Straus & Co., Incorporated, might assert as a bar to a claim by a bondholder. Besides, if the theory advanced by the claimant be accepted, that the " unused balance " may be assumed to be what S. W. Straus & Co., Incorporated, fixed it on its books when it closed the account, its claim is outlawed. The last deposit was made before May, 1923; the account was closed December 31, 1924.

There are also asserted claims against the receiver by reason of the alleged misapplication of funds received by S. W. Straus & Co., Incorporated, as fiscal agent. The claim of The Continental Bank and Trust Company in reference to 1133 Park avenue is in that class. There, S. W. Straus & Co., Incorporated, underwrote and sold to the public a $675,000 serial bond issue, dated August 30, 1923, secured by a trust mortgage on 1133 Park avenue. The Continental Bank and Trust Company is successor trustee under this mortgage. The obligor was required at fixed times to deposit with the fiscal agent interest and installments of principal to be applied annually towards the retirement of specifically numbered bonds; $28,000 of such bonds were by the terms of the indenture to become due on September 1, 1931. Before that date the obligor had deposited on account of that principal, $10,950 as asserted by the claimant, or $9,333.36 as admitted by the receiver. This fund, with the consent of the obligor, was applied towards the payment of interest, and thus the bonds due September 1, 1931, remain unpaid. The trustee under the mortgage asserts that such use of that fund constitutes a misapplication, and on behalf of those whose bonds should have been paid asserts the present claim.

The trust indenture provides that when deposits are made by the obligor with the fiscal agent " the liability of the Company (obligor) with respect thereto shall be discharged and the holders of the bonds or coupons covered by such payments shall to the extent of such payments look for the payment thereof, if any, solely to said S. W. Straus & Co., Incorporated, * * * and shall cease to be entitled to the benefits of this indenture on account of said bonds or coupons to the extent of the particular payment."

It is not claimed that under the terms of the trust mortgage a trust was created of the moneys deposited. The relationship was that of debtor and creditor. S. W. Straus & Co., Incorporated, was not a party to the trust mortgage. The obligation to apply the deposits according to the provisions of the trust indenture arises from its acceptance of the deposits. No doubt those bondholders whose bonds might have been paid from this fund have a just grievance. The question here is as to the right of the trustee to assert their claims. It contends that it has a right to collect, for the sole purpose of distributing among those bondholders who are entitled to payment. Under the trust indenture the trustee has the exclusive right to assert the demands, *under that instrument*, of bondholders. The obligation here asserted is extrinsic to the trust mortgage. It is specifically provided that when the obligor makes the deposits of principal with the fiscal agent, the obligor

shall be *pro tanto* discharged from liability to the bondholders and that the latter "shall look for payment — solely to said S. W. Straus & Co., Incorporated, and shall cease to be entitled to the benefits of this indenture." By the plain language of this instrument the holders of the bonds who became entitled to payment are no longer beneficially interested in the trust mortgage. In place of their bonds there was substituted the personal obligation of the fiscal agent. No provision of the trust mortgage confers any right on the trustee to assert this liability on behalf of the specially aggrieved bondholders.

In accordance with the views here expressed, the claims have been recommended for disposition in the accompanying report. (Report not published.)