THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* S. W. STRAUS & Co., INCORPORATED, and Others, Defendants.

Supreme Court, Additional Special Term, Kings County, January 14, 1936.

*Nathaniel L. Goldstein* [*Edmund W. Van Voorhis* of counsel], for Louis F. Schultze, receiver.

*Glass & Lynch* [*Simon Brett, Jerome Weinstein* and *Sydney W. Cable* of counsel], for the receivers of S. W. Straus & Co., Incorporated, of Delaware, and for S. W. Straus & Co. of Maryland, and associate counsel with *Newman & Bisco* for 565 Fifth Avenue Corporation, a creditor.

*Maurice B. & Daniel W. Blumenthal* [*Daniel W. Blumenthal* of counsel], for the Bondholders Protective Committee and various claimants.

Other attorneys appearing for other claimants.

LOCKWOOD, J. This motion is to confirm the report of Hon. Harry A. Gordon, the referee designated to hear and report upon 1,402 claims filed by creditors against S. W. Straus & Co., Inc., in receivership. (See 158 Misc. 186.)

On March 3, 1933, upon motion of the Attorney-General of this State, William M. Calder and Robert Moses were named receivers of the Straus Company. They resigned within a few days, finding the company a mere shell with but $29,000 in bank and assets of doubtful value, and on March 17, 1933, Louis F. Schultze was appointed successor receiver and has since given all his time to the trust.

The Appellate Division of the Supreme Court of this department, upon application of attorneys for real estate bondholders' committees, designated this court to hold an Additional Special Term to hear all matters relating to the receivership.

The Straus concern did not guarantee mortgages or mortgage bonds. It acted as a mortgage broker. If an individual or corporation was putting up a structure, it would make the building and permanent mortgage, collect a fee as broker, and sell the bonds, secured by said mortgage, to the public.

During the fifty or more years of its existence, it developed a large clientele throughout the United States and readily sold the issues it sponsored until the coming of the depression. Then, to avoid, or postpone defaults, it advanced interest and tax moneys and in this and other ways acquired assets which by 1933 became of doubtful value. A substantial part of the assets consisted of these interest and tax advances and matured bonds, which bonds it subordinated to those still outstanding in the hands of purchasers.

The receiver by diligent efforts has reduced some of these assets to cash and has now on hand in bank $154,000, and is at work with his counsel upon realizing additional funds on the remaining assets.

All the moneys ultimately in charge of the receiver will be divided among the creditors whose claims are allowed, less the expenses. Thus, it must be clearly understood that from the funds collected by the receiver and to be collected by him the expenses of the administration of this receivership hereinafter referred to in more detail must be paid.

The receiver and counsel have, in fact, conducted a bureau of information, and during the period since his appointment, in March, 1933, reports that 50,000 inquiries, mostly from bondholders, had been answered, upwards of 30,000 bondholders interviewed, many thousands of telephone inquiries made, and over 90,000 pieces of literature in reference to reorganizations, mailed.

There were approximately 160 mortgage bond issues in default, totaling over $214,000,000, affecting 60,000 bondholders. The effort has been to keep bondholders informed and to co-operate with the various government and State agencies and bondholders' committees in the supplying of data and information. The corporation's records were available to the so-called Sabath Congressional Committee, Streit Legislative Committee, Federal Securities Exchange Commission, and the Federal and local district attorneys, counsel for individual bondholders and bondholders' committees, and to the courts in numerous pending actions. The Federal Securities Exchange Commission and other bodies have commended the receiver's office for efficient and prompt co-operation. This all required much time and necessarily cost money to the receivership.

The 1,402 claims heard by the referee covered about forty-seven bond issues, necessitated preparation for trial, by the receiver and counsel, for each claim. Hearings were held at the receiver's office, covered a period of nine months, consuming seventy-two days. About 4,000 pages of testimony were taken; to cut the expense a stenographer was engaged at a weekly salary of $40, total cost $1,900, as against $10,000, the estimated cost if the hearings had been covered by public stenographers.

The claims filed and heard by the referee fall into three general classes:

(a) Claims by bondholders who alleged that they had been induced to purchase their bonds by false and fraudulent representations made to them by the salesmen employed by S. W. Straus & Co., Incorporated, at the times when such purchases were made.

(b) Claims filed by those who had rendered services to S. W. Straus & Co., Incorporated, and who were unpaid at the date of the appointment of the receivers.

(c) Claims filed by trustees and by bondholders who alleged that S. W. Straus & Co., Incorporated, had diverted moneys which had been deposited with it and applied such moneys to purposes other than those for which said deposits had been made.

The referee recommends the allowance of bondholders' claims upon condition that the bonds, the subject of the claim, be surrendered to the receiver.

Many claimants produced " certificates of deposit " for bonds deposited with committees formed on defaulted issues.

S. W. Straus & Co. organized its officers and employees into bondholders' protective committees for various issues. Later on, the bondholders' protective committee (so-called Roosevelt com-

mittee) and the independent bondholders' committee (Pounds committee) were organized and acted in many Straus issues and the Straus Company wrote letters to the people to whom it had sold the bonds, urging them to deposit with said committees.

The deposit agreements provide for the payment of fees to committee members and of all advances or other indebtedness or liability incurred by committees with counsel fees and charges of expenses of depositaries and provide that a dissenting depositing bondholder may withdraw his bond upon notice and payment of such amount as the committee in its absolute discretion may fix. The agreements also authorize the committees to pledge depositors' bonds to raise funds for committee requirements.

This court learned at the public hearing of bondholders that in many cases because of financial distress, bondholders are unable to secure the return of bonds as they cannot pay the committee charges.

For example: The No. 1 West Fifty-seventh Street issue, deposited bonds were pledged with a bank as security for a loan to the committee; this issue was a second lien and was wiped out upon foreclosure of the first mortgages on said property. The bank loan to the committee was called, not paid, and the pledged bonds sold, bought in by the lending bank, which refuses to surrender them unless these depositing bondholders, whose security was wiped out, pay the bank the proportionate share of what it loaned to the committee.

Thus, bondholders who, the referee finds were defrauded, would be penalized for depositing their bonds; for taking the action which S. W. Straus & Co. urged them to take, representing such action was for the bondholders' best interests. It would seem inequitable to require return of the original bonds as a prerequisite for rescission.

The referee's recommendation is modified to permit holders of certificates of deposit to deliver them, properly indorsed, to the receiver of S. W. Straus & Co.

Objections to bondholders' claims allowed are made by 565 Fifth Avenue Corporation, a creditor of the Straus concern, claim $349,136.03, arising on a lease by said company to Straus of the building 565 Fifth avenue, New York, the principal office of the Straus concern. The lease required S. W. Straus & Co. to pay, among other items making up the rental, the bonds maturing each year and the annual interest on the bond issue made by the 565 Fifth Avenue Corporation, which bonds were secured only by a leasehold on the property which lease was terminated through dispossess proceedings and the holders of these bonds thus completely wiped out. The original issue of $3,000,000 was reduced by March, 1933, to $1,800,000. Bondholders of $43,500 of these bonds proved their claims before the referee.

The only asset of 565 Fifth Avenue Corporation is this claim against the receiver and the dividend it will receive is the only fund from which holders of its bonds can be paid anything. Said company urges disallowance of the claims approved by the referee on other issues so that its dividend may be increased. This objection if allowed would in effect give the holders of 565 Fifth Avenue Corporation bonds a preference. Any dividend moneys which may be paid to said corporation will be subjected to attorneys' fees and other charges before any of it reaches the holders of the bonds of said company.

It is also clear that if all the holders of that issue filed claims with the receiver and the claims were allowed, the receiver, as the holder of all the bonds of said company, would become entitled to the dividend which might otherwise go to the corporation. The claim filed by the 565 Fifth Avenue Corporation and accepted by the receiver is allowed upon condition that all fees, charges and expenses of any nature against the bondholders of that issue or the corporation, shall, before payment or distribution, be submitted to and approved by this court or by a justice of the Supreme Court in New York county.

In cases where bondholders whose claims were allowed by the referee have received from the mortgage trustee a distribution on account of principal, since the allowance of the claims, the bonds may be delivered to the receiver who will deduct and retain the amount of such distributive payment from the dividends to bondholders upon their claims, as allowed.

In cases where mortgaged property has been reorganized and bondholders have accepted the new securities, or where bondholders, after their claims were recommended for allowance by the referee, have sold their bonds, the claims are deemed to have been abandoned and are not allowed.

Claims filed to March 31, 1935, were all heard and decided by the referee. A large number of additional claims have since been filed. Under section 48 of the Civil Practice Act, claims based on fraud are not barred until six years after the discovery of the fraud. Although section 174 of the General Corporation Law provides that a receiver shall publish notice to creditors to prove claims by a date specified, there is no provision working a forfeiture for failure to file claims within the time stated. A contrary intent is indicated, for section 182 provides that a creditor who failed to file a claim before the first dividend, who proves it before the final dividend, shall receive the sum he would have been entitled to on the first dividend before any distribution shall be made to other creditors.

Section 187 provides that a receiver is not answerable to any creditor unless the claim is proved before the final dividend. Here

no distribution has yet been made. The matter is referred back to Hon. Harry A. Gordon as referee to hear and report as to alleged claims filed with the receiver since March 31, 1935.

Bondholders whose claims are allowed must clearly understand that they are not compelled to act on this decision and to return their bonds to the receiver and to accept the dividend the receiver may be able to pay, if it will be to their advantage to retain the bonds.

Many bonds upon which claims were proved have a higher market value than the dividend the receiver estimates he may be able to pay; other bonds have no market value, their security having been wiped out by the foreclosure of first mortgages. While it is true that bondholders who elect to retain their bonds thereby abandon their claim against the receivership estate, ordinary business judgment would indicate that if they can realize more by retaining their bonds, they should do so.

The court can only determine the rights of bondholders. It cannot create a fund to pay the claims allowed, and again bondholders must understand that the most they can realize on bonds they surrender to the receiver is the dividend which the receiver may be able to pay.

The court suggests to bondholders that before deciding to return bonds to the receiver, they consult the officers of their business or savings banks, building and loan associations, or some business man in whom they have confidence, the trustee of the particular issue, or any friend upon whose judgment they rely. The receiver will place before them all facts in his possession to assist bondholders in reaching a decision. Every bond issue stands by itself and the only security back of the bond is the property upon which the mortgage securing the bond issue was placed. In some cases there are individual guaranties of doubtful value. If the mortgage was a second or general lien and has been wiped out by the foreclosure of prior mortgages, the second or general mortgage bonds have no security back of them.

If it was a second, or general issue, and has not been affected by foreclosure of first mortgages, the said first or prior mortgages come ahead of the second and general bond issue.

All the receiver can pay must come from the money he now has on hand and can obtain from the assets still in his keeping. His report of December 31, 1935, shows about $154,000 cash on hand in bank and assets upon which he hopes to realize an additional substantial amount.

There must first be deducted from the assets the preferred claim of the State of New York for $77,000 for unpaid franchise taxes, the

reasonable expenses of operating the receivership such as office rent, telephone, printing, postage, employees' salaries, the receiver's fees fixed by law, and reasonable compensation for counsel, referee's fees and all other necessary proper charges. The balance then remaining will be the total fund available for the payment of claims on a proportionate and *pro rata* basis.

As the work is not yet completed, these amounts cannot be estimated at this time.

A claim is being asserted by the United States government for $250,000 for unpaid income taxes, interest and penalties, which the receiver's counsel states in his opinion cannot legally be established by the government. However, should it be established as a valid claim, there would be nothing here left for bondholders, as a claim of the United States government has a preference under our laws.

To date, the receiver has approved claims totaling $775,000 and the referee an additional $1,000,000 to which must be added further claims hereafter proved and allowed. If the government claim is *not* allowed, the receiver hopes to pay something in the neighborhood of ten cents on the dollar.

The presentation of the claims heretofore heard by the referee required much time and painstaking effort.

The referee, a former judge and a leading member of the bar of outstanding ability, has considered all claims carefully and written an opinion which the court feels fully covers the subject. His work is commended and the court regrets that the small amount of assets will not permit of the allowance of an adequate fee for his services, when the large amount of work done is considered.

All bondholders who elect to take the benefit of the claims allowed by the referee and approved by the court, must deposit and deliver their original bonds or certificates of deposit properly indorsed, to Louis F. Schultze, receiver of S. W. Straus & Co., Incorporated (New York), at his office, No. 565 Fifth avenue, New York, on or before April 1, 1936. Receiver is directed to send proper notice to all bondholders whose claims have been allowed on or before February 1, 1936, advising them of the allowance of the claims and of the need to deposit the bonds or the certificates, as herein provided.

Any bondholder may elect to deposit all or part of the bonds or certificates of deposit upon which his or her claim was based and which was allowed herein and the receiver is directed to apportion such claim and allowance in accordance with the evidence before and the findings of the referee.

The report of Hon. Harry A. Gordon, referee, as modified herein, is confirmed and adopted as the judgment of this court; all other objections to said report and applications for rehearing for the opening of defaults and for other and different relief are dismissed.